**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 29, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

KAY ELECTRIC COOPERATIVE, an
Oklahoma Rural Electric Cooperative;
and KAY COUNTY RURAL WATER
DISTRICT NO. 3, an Oklahoma Rural
Water District,

     Plaintiffs - Appellants,

v.

THE CITY OF NEWKIRK,
OKLAHOMA, a Municipality; and
THE NEWKIRK MUNICIPAL
AUTHORITY, a public trust,

     Defendants - Appellees.

----------------------------------------------

OKLAHOMA ASSOCIATION OF
ELECTRIC COOPERATIVES,

     Amicus-Curiae.

No. 10-6214

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 10-CV-00347-C)**

---

Douglas A. Rice, Derryberry & Naifeh, LLP, Oklahoma City, Oklahoma (Larry
Derryberry and Pete G. Serrata III, Derryberry & Naifeh, LLP, Oklahoma City,
Oklahoma, and Jonathan C. Ihrig and Andrew M. Ihrig, Ihrig Law Firm,
Blackwell, Oklahoma, with him on the briefs) for Plaintiffs - Appellants.

Andrew W. Lester (Carrie L. Williams, Lester, Loving & Davies, P.C., Edmond, Oklahoma, with him on the brief), for Defendants - Appellees.

Michael Burrage, Whitten Burrage, Oklahoma City, Oklahoma, for Amicus - Curiae.

---

Before **MURPHY, GORSUCH,** and **MATHESON**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

When a city acts as a market participant it generally has to play by the same rules as everyone else. It can't abuse its monopoly power or conspire to suppress competition. Except sometimes it can. If the city can show that its parent state authorized it to upend normal competition, to install instead a municipal monopoly, the city enjoys immunity from federal antitrust liability. The problem for the City of Newkirk in this case is that the state has done no such thing.

Newkirk and Kay Electric Cooperative both provide electricity to Oklahoma consumers. Traditionally, Newkirk has served customers inside its city limits while Kay, a rural electrical cooperative, has served nearby customers outside the city boundaries. When the announcement came that a new jail would be built just outside Newkirk, Kay naturally offered to provide electricity. But unwilling to let so lucrative an opportunity slip away, Newkirk responded by annexing the area and issuing its own service offer. At the end of the day, Kay's

- 2 -

offer was much the better but the jail still elected to buy electricity from Newkirk. Why? Because Newkirk is the only provider of sewage services in the area and it refused to provide any sewage services to the jail — that is, unless the jail also bought the city's electricity. Finding themselves stuck between a rock and a pile of sewage, the operators of the jail reluctantly went with the city's package deal.

As these things go Kay responded by suing Newkirk, alleging that the city had engaged in unlawful tying and attempted monopolization in violation of the Sherman Act. 15 U.S.C. §§ 1, 2. But the district court refused to allow the case to proceed, granting Newkirk's motion to dismiss under Fed. R. Civ. P. 12(b)(6) after it found Newkirk "immune" from liability as a matter of law. It is this ruling Kay challenges on appeal.

The Sherman Act has little to say about municipal immunity, at least directly. It contains only the broadest and barest of proscriptions against anticompetitive activity — declaring unlawful any contract, combination, or conspiracy in restraint of trade and forbidding any monopoly or attempt to monopolize. Over the last 120 years, however, much judicial embroidery has stitched out the scope of permissible and impermissible competitive activity under the Act, handiwork that's often been informed by evolving (if sometimes competing) schools of economic thought. One particular development, however, and the one at issue in this case, has less to do with economic regulation than state sovereignty.

While the Sherman Act clearly forbids anticompetitive conduct by *private* market players, what about conduct by *state* actors? In *Parker v. Brown*, 317 U.S. 341 (1943), the plaintiff argued that the Act's sweeping terms don't distinguish between private and public players, that states must live by the same antitrust rules as everyone else. The Supreme Court, however, disagreed. It assumed without deciding that Congress *could* constitutionally preempt state law directing state actors to behave anticompetitively. *Id.* at 350. But at the same time the Court said there's "no hint" Congress wished to attack and undo such state sanctioned restraints of trade when it passed the Sherman Act. *Id.* Given this, and given the importance of federal-state comity, the Court held that the Act's terms should not be read to preempt *state imposed* restraints of trade. States may regulate economic activity as they wish, pursuing even patently anticompetitive policies without having to look over their shoulders to see if Congress approves. *Id.* at 351. Thus was born the concept of "state action immunity" (though the term "immunity" may be a bit strong since the Court held only that Congress *hadn't* covered state action, not that it *couldn't*).

The Court's answer in *Parker*, however, soon begot new questions of its own. If states are free from federal antitrust worries, what about the municipal agents they create and through which they often act? When the Supreme Court eventually took up this question, it conclusively answered it inconclusively, holding that a municipality *sometimes* may be sued under the Sherman Act and

*sometimes* it may not. Because municipalities "are not themselves sovereign," the Court reasoned, they should not automatically be eligible for the "federal deference [given to] the States that create them." *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 412 (1978) (plurality); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38 (1985). A municipality's "parochial interests" in anticompetitive policies, the Court added, don't necessarily implicate the federalism concerns that animate the state action immunity doctrine and shouldn't always be placed "above the Nation's economic goals reflected in the antitrust laws." *Lafayette*, 435 U.S. at 412-13. Perhaps surprisingly, the Court told us, this means not only that the Sherman Act *can* sometimes *preempt* a municipality's actions; it also means that municipalities may be subject to treble damage awards for violating the Act. *See generally* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 223 (Aspen 3d ed. 2006); *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 60-61 (1982) (Rehnquist, J., dissenting). At the same time, the Court held, if a *state* expressly adopts an anticompetitive policy and chooses to use its municipal subdivisions as instruments to effect that policy, then the federal-state comity concerns undergirding the *Parker* state immunity doctrine *do* come into play. And "[i]t is therefore clear," the Court concluded after laying all this out, "that a municipality will be entitled to the protection of the state action exemption from the antitrust laws" only if there is a "clear articulation of a state policy to authorize anticompetitive conduct" by the municipality. *Hallie*,

471 U.S. at 34 (internal quotation omitted); *see also Boulder*, 455 U.S. at 54-55; *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 373 (1991).  Put simply, at the end of the day a municipality shares the state's "immunity" when but only when it is implementing anticompetitive policies authorized by the state.

How *clearly* must a state legislature articulate its authorization of anticompetitive municipal conduct to trigger antitrust immunity?  Now many decades removed from *Parker*, the Court has sometimes declared that its judicially created "[s]tate-action immunity [should be] disfavored," *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 635-36 (1992) (citing *Lafayette*, 435 U.S. at 398-99), and, because of this, a municipality's authority to suppress competition must be "*clearly articulated* and *affirmatively expressed*" in state legislation. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980) (emphasis added); *Ticor*, 504 U.S. at 636 (requiring "real compliance" with *Midcal*).  At other times, however, the Court has appeared to require something *less* of cities seeking to invoke *Parker*'s protections, suggesting that a municipality's actions are free from the grasp of federal antitrust law if anticompetitive effects "*logically would result*" from state legislative policy. *Hallie*, 471 U.S. at 42.  Complicating matters still further, the Court has also said that a municipality may be authorized to engage in anticompetitive actions that are merely the "*foreseeable result*" of state legislation.  *Id.* (emphasis added).

With its usual care Professor Areeda and Hovenkamp's treatise traces all these warps and wefts before gently suggesting that "while the policy favoring competition is national and the states are permitted to establish an alternative regime," states should be required to "declare their intentions clearly rather than falling back on the ambiguity-creating compromises that often characterize the legislative process." Areeda & Hovenkamp, Antitrust Law ¶ 225a at 133. Such a bright line rule, they have said, would "do a much better job of identifying the relevant principle of federalism that undergirds the *Parker* doctrine." *Id.* But however much sense this makes (and we think it makes quite a lot of sense), our lot as a lower court isn't to choose between the Supreme Court's holdings but to apply them. And though it's hard to see a way to reconcile all of the Court's competing statements in this area, we can say with certainty this much — a municipality surely lacks antitrust "immunity" unless it can bear the burden of showing that its challenged conduct was *at least* a foreseeable (if not explicit) result of state legislation. Of course, what does and doesn't qualify as foreseeable is hardly "self-evident" or self-defining, itself perhaps another reason to eschew the test. *See id.* ¶ 225b3 at 144. But there *are* at least a few bright lines we can discern in this muddled arena — and these are enough to allow us to dispose of this appeal with confidence.

*First*, a state's grant of a traditional corporate charter to a municipality isn't enough to make the municipality's subsequent anticompetitive conduct

foreseeable. Municipal charters typically endow the municipality with the authority to make contracts, to buy and sell property, to enter into joint ventures. But most private corporate charters allow companies to do these same things. And natural persons win these powers simply by reaching the age of majority. Neither companies nor persons automatically take with these pedestrian powers the right to use them in an anticompetitive fashion, and there's no reason to think municipalities do either. Put simply, simple permission to play in a market doesn't foreseeably entail permission to roughhouse in that market unlawfully. *See Boulder*, 455 U.S. at 54-55; Hovenkamp, Antitrust Law ¶ 225b5 at 155 (giving as examples a municipality's operation of golf courses and swimming pools and explaining that monopoly in "such facilities is hardly inevitable"); *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Svc. Dist. No. 1*, 171 F.3d 231, 235 (5th Cir. 1999); *Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 402-03 (9th Cir. 1991).

*Second*, the fact that a state may have authorized *some* forms of municipal anticompetitive conduct isn't enough to make *all* forms of anticompetitive conduct foreseeable. Antitrust violations come in a variety of flavors and just because the state has authorized one doesn't mean it has authorized all. As the Court has put it, "even a lawful [municipal] monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." *Lafayette,* 435 U.S. at 417; *see also*

*Hallie*, 471 U.S. at 44 ("[T]he legislature contemplated *the kind of action* complained of.") (emphasis added); *Midcal*, 445 U.S. at 105; Areeda & Hovenkamp, Antitrust Law ¶ 225a at 132-33.

*Third*, when asking whether the state has authorized the municipality's anticompetitive conduct we look to and preference the most specific direction issued by the state legislature on the subject. After all, it is long and well settled that whenever we construe legislative enactments — and that's precisely what we're called on to do when deciding a municipality's antitrust immunity in light of state authorizing legislation — "a specific statute controls over a general one without regard to priority of enactment." *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961); *Edmond v. United States*, 520 U.S. 651, 657 (1997).

Applying these rules to our case, it quickly becomes clear that Newkirk enjoys no immunity. The Oklahoma legislature has spoken with specificity to the question whether there should be competition for electricity services in annexed areas. And it has expressed a clear preference for, not against, competition. While Newkirk cites a number of more general enabling statutes conferring on the city the authority to do business, none authorizes the kind of anticompetitive conduct alleged here, let alone suggests that we may ignore the more specific provisions of law indicating it may not.

The most specific legislation relevant to our inquiry the parties have identified is § 437.2 of the Rural Electric Cooperative Act. Part of Oklahoma law

since 1961, this provision expressly entitles rural electric cooperatives like Kay to "continue and extend furnishing of electric energy" in areas they have traditionally serviced even after those areas are annexed by a municipality. 18 Okla. Stat. § 437.2(k). This provision thus speaks directly to both the area and issue in this lawsuit. It is undisputed that the jail lies in an area traditionally serviced by Kay; that the area has now been annexed by Newkirk; and that Newkirk is allegedly thwarting Kay's ability to operate there. And § 437.2(k) doesn't merely *authorize* Kay to continue to compete in annexed areas; it *protects* Kay from municipal interference in those areas, allowing Kay to continue to operate without having to seek or obtain "consent, franchise, license, [or] permit" from Newkirk. Far from displacing competition, then, this language foreseeably does just its opposite — it seeks to *preserve* competition after annexation by constraining municipalities from using their considerable regulatory powers to harm rival rural electricity providers. Underscoring the point, the statute goes on to say a municipality may impose only two conditions on electric cooperatives operating in annexed areas — it may force them to pay taxes and comply with safety regulations. The fact that the statute fails to authorize any other municipal burden on competition is glaring. *See United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When [the legislature] provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . is that

[the legislature] considered the issues of exceptions and, in the end, limited the statute to the ones set forth.").

This specific and state-sanctioned battle for electricity customers in annexed areas rests against an even grander plan to expand competition in electricity markets. In 1997, the Oklahoma legislature enacted the Electric Restructuring Act seeking to "allow direct access by retail consumers to the competitive market for the generation of electricity while maintaining the safety and reliability of the electricity system in the state." 17 Okla. Stat. § 190.2. Creating a joint task force to promote restructuring, this law expressly aims to "provide greater competition and more efficient regulation," "increase[] consumer choice," and "provide electric generation service at the lowest and most competitive rates." *Id.*; *see also* 17 Okla. Stat. § 190.4 ("Competitive markets are to be encouraged to the greatest extent possible."). Here again, Oklahoma has expressed an unmistakable policy preference for competition in the provision of electricity.

Of course, Newkirk replies that the Electric Restructuring Act has yet to restructure much of anything. The sort of competition it envisions has yet to emerge on the scale the legislature hoped, Newkirk says. And perhaps this is so. But no one denies that the Restructuring Act *is* on the books or that it expresses a policy preference for competition in electricity generation and supply. Neither is it the place of a court to say whether, over the last fourteen years since the

- 11 -

statute's enactment, Oklahoma has moved too slowly or quickly in its efforts to restructure an entire industry.  And no one before us has been so bold as to suggest that desuetude might render this statute, only in its teenage years, a dead letter we might simply ignore.  *See* Norman J. Singer & J.D. Shambie Singer, 1A Statutes and Statutory Construction § 23:26 at 533 (7th ed. 2009) ("The doctrine of separation of powers prevents holding that a legislative enactment . . . is ineffective by nonuse or obsolescence.").  Besides, competition *is* already a manifest reality between cooperatives and municipalities in Oklahoma — as this case itself attests — and the state has taken other affirmative steps to increase this form of competition by conducting studies and declaring a moratorium on efforts by cities to condemn competing private facilities.  *See* 11 Okla. Stat. § 21-222.

In reply to all this, Newkirk draws our attention to various other provisions of state law, some of which merit attention here.  Each, however, speaks with far less specificity to the challenged conduct than either the Cooperative Act or Restructuring Act.  In fact, Newkirk begins its case with and emphasizes heavily throughout its brief the most general and least specific laws of all, portions of the Oklahoma state constitution that merely authorize municipalities to do business. *See* Okla. Const. Art. 18, §§ 6, 7.  But this hardly tells us much of anything.  As already explained, it is well settled that general municipal charters are never enough to trigger *Parker*'s protections.

Newkirk next draws our attention to 11 Okla. Stat. § 22-104.  On inspection, however, this provision (similarly) turns out to be nothing more than a general enabling statute allowing municipalities to run utilities.  Of course, one might argue that at least certain utilities are "natural" monopolies and so a great variety of anticompetitive conduct, including the conduct challenged in this case, would foreseeably follow from allowing a city to operate a utility.  But we reject any such suggestion.  For starters, and as we have already explained, Supreme Court precedent doesn't support the idea that an enabling law permitting a city to run a business is enough to produce *Parker* immunity.  Beyond that, Newkirk's reading would require courts to decide whether a particular utility is or isn't a "natural" monopoly.  And that's a business as busy as a box of frogs.  "Natural" monopolies are hardly always obvious or immutable.  What one might call a natural monopoly in one place might not be a natural monopoly in another, and what might be a natural monopoly today might not be one tomorrow (think telephones and railroads).  *See* Alfred E. Kahn, 2 The Economics of Regulation: Principles and Institutions 10 (1971) ("[T]echnology is perpetually developing: so the natural monopoly of yesterday may no longer be natural today."); Richard A. Posner, *Natural Monopoly and Its Regulation*, 21 Stan. L. Rev. 548, 636 (1969) ("[N]atural monopoly conditions are quite likely to be transient.").  For an anticompetitive result to qualify as a foreseeable consequence of state legislative policy, we believe and hold, it should be plainer and easier to ascertain in

advance than a court's ruling on whether a particular business at a particular time and in a particular place qualifies as a "natural" monopoly.

Trying another angle, Newkirk argues that 17 Okla. Stat. § 190.7 demonstrates an intent by Oklahoma to limit competition in the electricity markets. And here Newkirk has at least something of a point. Section 190.7 *does* forbid a rural electrical cooperative like Kay from taking a municipality's *existing* customers. The difficulty is that nothing in § 190.7 prohibits a rural electrical cooperative from competing against a municipality for *new* customers in annexed areas. And this is hardly surprising given that (as we've seen) § 437.2(k) expressly guarantees Kay the right to do exactly that. Neither is the question before us whether Oklahoma has sought to make the electricity market competitive in every respect. It is instead, and as we have already explained, only whether Oklahoma has authorized the *specific form* of anticompetitive conduct under attack. And in this case Kay has challenged Newkirk's ability to preclude it from winning a *new* customer, *not* taking Newkirk's *existing* customers. On that, the question posed by this case, § 190.7 has nothing to say.

An even greater problem besets Newkirk's reliance on 18 Okla. Stat. § 437.2(k). Newkirk notes that this statute allows municipalities, after annexing an area, to expropriate the facilities of the incumbent rural electric cooperative. On first blush this appears to be the strongest evidence yet of a legislative intent to allow municipalities to monopolize electricity markets within their borders.

But, as part of its plan to bring more competition to electricity markets, the state legislature recently and expressly *suspended* these very powers. *See* 11 Okla. Stat. § 21-222. So if anything Newkirk's citation winds up doing more harm than good to its cause.

In a final stand, Newkirk insists that our decision to allow this case to proceed cannot be reconciled with *Hallie* or *Sterling Beef Co. v. City of Fort Morgan*, 810 F.2d 961 (10th Cir. 1987). Analogies to these cases, Newkirk insists, demonstrate its entitlement to *Parker* immunity. In truth, however, they do nearly the opposite.

In *Hallie*, the Court confronted a state statute that authorized municipalities to delineate the area in which it wished to afford sewage services. When the defendant-city did just that, some nearby towns complained that the city had refused to treat sewage from outside the city's delineated boundaries, and alleged that the city's refusal to share or provide access to its treatment plant amounted to a violation of the Sherman Act. The Court found *Parker* immunity because the city's conduct was just the sort of thing the state legislature had authorized. But, by contrast in our case, there's nothing on Oklahoma's statute books to suggest that the legislature authorized the species of antitrust violation alleged here — refusing to provide an end customer one service (sewage) unless he purchased something entirely different (electricity). At the end of the day, Oklahoma law simply allows Newkirk to provide sewage and electricity services. And it is no

more foreseeable from this fact that Newkirk might unlawfully use its sewage business to sell electricity than to sell magazines, or life insurance, or require the prison to be painted a particular color. To say that the authority to provide services in two markets authorizes a municipality to do whatever it wants in one or both of those markets would be to let the *Parker* immunity exception swallow the Sherman Act's antitrust rule.

*Hallie* is beside the point for another but still related reason. It involved a situation where the legislative evidence ran but one way — the only relevant statute in the case tended to suggest that the particular challenged anticompetitive conduct was foreseeable. Meanwhile, the statutes identified by plaintiffs to suggest a pro-competitive state policy were introduced too late in the proceedings. And, as it turned out, they were themselves no more than general enabling statutes authorizing the plaintiffs to conduct business. *See* 471 U.S. at 42 n.5. *Hallie* thus doesn't tell us anything about the situation we face — where specific state statutes authorizing competition are compared to more general ones that are at best only susceptible to an anticompetitive gloss.

*Sterling Beef* is no more and perhaps even less analogous. The municipality there operated a natural gas utility. Under state law, it enjoyed the power not just to operate its own utility but also to decide whether to allow competitors to provide distribution systems within its territorial limits. The municipality denied authorization to a distributor who wished to build its pipes

within city limits. When the distributor brought an antitrust suit, this court —unsurprisingly — held that an "anticompetitive impact" is the "obvious result of the state scheme." *Sterling Beef*, 810 F.2d at 964. Indeed, the statute amounted to an express permission to create a monopoly if the municipality wished; competition could exist only at the city's grace. *See also Allright Colo., Inc. v. City and Cty. of Denver*, 937 F.2d 1502, 1508-09 (10th Cir. 1991) (finding antitrust immunity where state statute authorized city to regulate all airport transportation services). This case could hardly be more different. Oklahoma expressly entitles Kay to provide electricity services in the annexed area at issue — and expressly frees it of the need to obtain Newkirk's "consent, franchise, license, permit, or other authority" to do so. 18 Okla. Stat. § 437.2(k). If *Sterling Beef* has any bearing on this case, then, it serves only as a study in contrast not commonality.

The district court's Rule 12(b)(6) dismissal order is reversed, and the case is remanded for further proceedings with respect to Kay's allegations of unlawful tying and attempted monopolization of electricity services. No other aspects of the district court's dismissal order were pursued in this appeal.