Certiorari granted by Supreme Court, March 3, 2014
Affirmed by Supreme Court February 25, 2015

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 12-1172**

───────────────

THE NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS,

        Petitioner,

        v.

FEDERAL TRADE COMMISSION,

        Respondent.

─────────────────────────────────

AMERICAN DENTAL ASSOCIATION; AMERICAN OSTEOPATHIC ASSOCIATION; AMERICAN VETERINARY MEDICAL ASSOCIATION; AMERICAN ACADEMY OF PEDIATRIC DENTISTRY; AMERICAN ACADEMY OF PERIODONTOLOGY; AMERICAN ASSOCIATION OF ORTHODONTISTS; AMERICAN ASSOCIATION OF DENTAL BOARDS; FEDERATION OF STATE MEDICAL BOARDS; AMERICAN MEDICAL ASSOCIATION; NORTH CAROLINA MEDICAL SOCIETY; SOUTH CAROLINA MEDICAL ASSOCIATION; MEDICAL SOCIETY OF VIRGINIA; WEST VIRGINIA STATE MEDICAL ASSOCIATION; NATIONAL ASSOCIATION OF BOARDS OF PHARMACY; NORTH CAROLINA BOARD OF PHARMACY; THE FEDERATION OF STATE BOARDS OF PHYSICAL THERAPY; THE FEDERATION OF ASSOCIATIONS OF REGULATORY BOARDS; THE ASSOCATION OF SOCIAL WORK BOARDS; THE AMERICAN ASSOCIATION OF VETERINARY STATE BOARDS; THE FEDERATION OF CHIROPRACTIC LICENSING BOARDS; THE FEDERATION OF STATE MASSAGE THERAPY BOARDS; INTERNATIONAL CONFERENCE OF FUNERAL SERVICE EXAMINING BOARDS, INCORPORATED; THE NATIONAL ASSOCIATION OF LONG TERM CARE ADMINISTRATOR BOARDS; THE NATIONAL BOARD FOR CERTIFICATION IN OCCUPATIONAL THERAPY,

        Amici Supporting Petitioner,

AMERICAN ANTITRUST INSTITUTE,

        Amicus Supporting Respondent.

───────────────

On Petition for Review of an Order of the Federal Trade Commission. (No. 9343)

_____

Argued:  December 5, 2012                    Decided:  May 31, 2013

_____

Before SHEDD, KEENAN, and WYNN, Circuit Judges.

_____

Petition denied by published opinion.  Judge Shedd wrote the opinion, in which Judge Wynn joined.  Judge Keenan wrote a separate concurring opinion.

_____

**ARGUED:** Noel Lee Allen, ALLEN, PINNIX & NICHOLS, P.A., Raleigh, North Carolina, for Petitioner.  Imad Dean Abyad, FEDERAL TRADE COMMISSION, Washington, D.C., for Respondent.  **ON BRIEF:** M. Jackson Nichols, Catherine E. Lee, Nathan E. Standley, Brenner A. Allen, ALLEN, PINNIX & NICHOLS, P.A., Raleigh, North Carolina, for Petitioner.  Richard A. Feinstein, Director, Richard B. Dagen, William L. Lanning, Willard K. Tom, General Counsel, John F. Daly, Deputy General Counsel for Litigation, FEDERAL TRADE COMMISSION, Washington, D.C., for Respondent. Jack R. Bierig, Dale E. Thomas, SIDLEY AUSTIN LLP, Chicago, Illinois, for American Dental Association, American Osteopathic Association, American Veterinary Medical Association, American Academy of Pediatric Dentistry, American Academy of Periodontology, American Association of Orthodontists, American Association of Dental Boards, and Federation of State Medical Boards, Amici Supporting Petitioner.  Leonard A. Nelson, AMERICAN MEDICAL ASSOCIATION, Chicago, Illinois; Stephen W. Keene, NORTH CAROLINA MEDICAL SOCIETY, Raleigh, North Carolina; J. Mitchell Armbruster, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina, for The American Medical Association and the Medical Associations for the States of North Carolina, South Carolina, Virginia, and West Virginia, Amici Supporting Petitioner.  Matthew W. Sawchak, Stephen D. Feldman, ELLIS & WINTERS LLP, Raleigh, North Carolina, for The National Association of Boards of Pharmacy and The North Carolina Board of Pharmacy, Amici Supporting Petitioner.  Lee K. Van Voorhis, Jennifer A. Semko, Jeremy W. Cline, BAKER & MCKENZIE, LLP, Washington, D.C., for The Federation of State Boards of Physical Therapy, The Federation of Associations of Regulatory Boards, The Association of Social Work Boards, The American Association of Veterinary State Boards, The Federation of Chiropractic Licensing Boards, The

2

Federation of State Massage Therapy Boards, International Conference of Funeral Service Examining Boards, Incorporated, The National Association of Long Term Care Administrator Boards, and The National Board for Certification in Occupational Therapy, Amici Supporting Petitioner. Richard M. Brunell, Director of Legal Advocacy, AMERICAN ANTITRUST INSTITUTE, Washington, D.C.; Peter C. Carstensen, UNIVERSITY OF WISCONSIN LAW SCHOOL, Madison, Wisconsin; K. Craig Wildfang, Ryan W. Marth, Scott M. Kranz, ROBINS, KAPLAN, MILLER & CIRESI L.L.P., Minneapolis, Minnesota, for American Antitrust Institute, Amicus Supporting Respondent.

───────────────

3

SHEDD, Circuit Judge:

The North Carolina State Board of Dental Examiners (the Board) petitions for review of the Federal Trade Commission (FTC) order finding that the Board violated the FTC Act, 15 U.S.C. § 45, by engaging in unfair competition in the market for teeth-whitening services in North Carolina. For the following reasons, we deny the petition.

I.

The Board is a state agency, N.C. Gen. Stat. § 90-48, created because the "practice of dentistry" in North Carolina affects "the public health, safety and welfare," N.C. Gen. Stat. § 90-22(1)(a). The eight-member Board is comprised of six licensed dentists, one licensed dental hygienist, and one consumer member. N.C. Gen. Stat. § 90-22(b). Dentists elect the six dental members, and dental hygienists elect the hygienist member. Id. § 90-22(c). If an election ends in a tie, the candidates are allowed to describe their positions on issues that will come before the Board before a revote is held. The Governor appoints the consumer member. The Board is funded by fees paid by licensed dentists and dental hygienists in North Carolina. Board members—other than the consumer member—are required to maintain an active dentistry practice while serving, and during the relevant time frame, several Board members provided teeth-whitening services.

4

North Carolina's Dental Practice Act provides that it is unlawful for an individual to practice dentistry in North Carolina without a license from the Board. See N.C. Gen. Stat. § 90-29(a). Under the Dental Practice Act, a person "shall be deemed to be practicing dentistry" if that person, inter alia, "[r]emoves stains, accretions or deposits from the human teeth." N.C. Gen. Stat. § 90-29(b)(2). The Board has the "power" to (1) refuse to issue a license to practice dentistry; (2) refuse to renew a license; (3) revoke or suspend a license; or (4) take other disciplinary measures "against a licensee as it deems fit and proper." N.C. Gen. Stat. § 90-41. If the Board suspects an individual of engaging in the unlicensed practice of dentistry, it may bring an action to enjoin the practice in North Carolina Superior Court or may refer the matter to the District Attorney for criminal prosecution. See N.C. Gen. Stat. § 90-40.1. This power is hardly unique, however, because such actions may also be maintained by the "Attorney General for the State of North Carolina, the district attorney of any of the superior courts," or "any resident citizen." Id. Moreover, the Board does not have the authority to discipline unlicensed individuals or to order non-dentists to stop violating the Dental Practice Act.

This case involves the market for teeth-whitening services in North Carolina. Teeth-whitening is a popular cosmetic dental procedure that is available in North Carolina, as in most

5

states, in several forms, including as an in-office dental treatment, as dentist-provided take-home kits, as over-the-counter products, and as services provided by non-dentists at salons, mall kiosks, and other locations. Each of these teeth-whitening services involves applying peroxide to the teeth by means of a gel or strip, which triggers a chemical reaction that results in whiter teeth. The services differ, however, in the immediacy of the results, the ease of use, the necessity of repeat applications, the need for technical support, and price. Not surprisingly, in-office dentist whitening procedures are fast, effective, and usually do not require repeated applications, but they are also the "most costly" offering. (J.A. 146). In contrast, over-the-counter whitening products typically contain lower concentrations of peroxide and may require multiple applications to achieve results, but they cost far less.

Beginning in the 1990s, dentists started providing whitening services throughout North Carolina. In about 2003, non-dentists also started offering teeth-whitening services, often at a significantly lower price than dentists. Shortly thereafter, dentists began complaining to the Board about the non-dentists' provision of these services.

Relevant here, after receiving complaints from dentists, the Board opened an investigation into teeth-whitening services

performed by non-dentists. A case officer (a dentist board member) spearheaded the investigation, leading an investigatory panel consisting of the Board's Deputy Operations Officer, an Investigator, and on occasion the Board's legal counsel. Although permitted to do so, neither the consumer member nor the hygienist member participated in any of the teeth-whitening investigations. During meetings, the Board discussed the increasing number of complaints regarding non-dentist teeth-whitening services and indicated to practicing dentists that the Board was attempting to shut down these non-dentist providers.

As a result of the investigations, the Board issued at least 47 cease-and-desist letters to 29 non-dentist teeth-whitening providers. The letters were issued on official letterhead and requested that the target cease and desist "all activity constituting the practice of dentistry." (J.A. 159). Several letters indicated that the sale or use of teeth-whitening products by a non-dentist is a misdemeanor. These letters effectively caused non-dentists to stop providing teeth-whitening services in North Carolina and also caused manufacturers and distributors of teeth-whitening products used by these non-dentist providers to exit or hold off entering North Carolina. The Board also sent letters to mall operators in an effort to stop malls from leasing kiosk space to non-dentist teeth-whitening providers; additionally, the Board

7

contacted the North Carolina Board of Cosmetic Art Examiners to request that the Cosmetic Board inform its members and licensees to refrain from providing teeth-whitening services.

In sum, the Board successfully expelled non-dentist providers from the North Carolina teeth-whitening market. On June 17, 2010, the Federal Trade Commission issued an administrative complaint against the Board, charging it with violating 15 U.S.C. § 45, the FTC Act, by excluding non-dentist teeth whiteners from the market. The Board moved to dismiss the complaint, arguing that the FTC lacked jurisdiction over it and, alternatively, that it was exempt from the federal antitrust laws under the "state action" doctrine. An Administrative Law Judge (ALJ) denied the motion, and the FTC affirmed. Interlocutory Order In re North Carolina State Bd. of Dental Exam'rs, 151 F.T.C. 607, 2011 WL 3568990 (FTC February 3, 2011) (Interlocutory Order). In response, the Board filed a federal declaratory action, raising the same grounds and requesting that a federal court stop the administrative proceeding against it. The district court dismissed that action as an improper attempt to enjoin ongoing administrative procedure.[1] North Carolina

---

[1] The Board has appealed that decision. See North Carolina State Bd. of Dental Exam'rs v. FTC, No. 11-1679. In light of our opinion in this petition for review, we have dismissed that appeal as moot.

State Bd. of Dental Examiners v. FTC, 768 F. Supp.2d 818 (E.D.N.C. 2011).

The ALJ then held a merits trial and issued an opinion finding that the Board violated the FTC Act. On appeal, the FTC—applying a de novo standard of review—affirmed and entered a final order against the Board that included a cease-and-desist order enjoining the Board from, inter alia, continuing to unilaterally issue extra-judicial orders to teeth-whitening providers in North Carolina. In re North Carolina State Bd. of Dental Exam'rs, 2011-2 Trade Cases P 77705, 2011 WL 6229615, at *2-5 (FTC December 7, 2011) (Final Order).

The Board petitions for review of the FTC's final order, raising three arguments: that it is exempt from the antitrust laws under the state action doctrine; that it did not engage in concerted action under § 1 of the Sherman Act; and that its activities did not unreasonably restrain trade under § 1. We address each in turn.

## II.

## A.

We begin with the Board's contention that it is exempt from the antitrust laws under the "state action" doctrine.[2] Under

---

[2] The Board also argues that the FTC lacked jurisdiction over it because it is not a "person" under the FTC Act, 15 U.S.C. § 45(a)(2). We find this argument to be without merit. (Continued)

9

this doctrine, the antitrust laws do "not apply to anticompetitive restraints imposed by the States 'as an act of government.'" City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 370 (1991) (quoting Parker v. Brown, 317 U.S. 341, 352 (1943)). In Parker, the Supreme Court announced this doctrine after recognizing that "nothing in the language of the Sherman Act or in its history . . . suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." 317 U.S. at 350-51. The Parker Court cautioned, however, that a state cannot "give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S. at 351.

There are "three situations in which a party may invoke the Parker doctrine." South Carolina State Bd. of Dentistry v. FTC, 455 F.3d 436, 442 (4th Cir. 2006). First, a state's own actions

---

The Supreme Court has held that a state is a "person" under the Sherman Act and the Clayton Act. Jefferson Cnty. Pharm. Ass'n v. Abbott Labs., 460 U.S. 150, 155 (1983) (Clayton Act); City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 395 (1978) (Sherman Act). In Jefferson County, the Court noted it did not "perceive any reason to construe the word 'person' in [the Sherman] Act any differently than we have in the Clayton Act." Jefferson Cnty., 460 U.S. at 156. Given the similarities between the FTC Act and the Clayton and Sherman Acts, we likewise find that the Board is a "person" under the FTC Act.

"ipso facto are exempt" from the antitrust laws.[3]  Hoover v. Ronwin, 466 U.S. 558, 568 (1984).  Second, private parties can claim the Parker exemption if acting pursuant to a "clearly articulated and affirmatively expressed as state policy" and their behavior is "actively supervised by the State itself." California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980) (internal quotation marks omitted). Third, as the Supreme Court recently reaffirmed, municipalities and "substate governmental entities do receive immunity from antitrust scrutiny when they act pursuant to state policy to displace competition with regulation or monopoly public service."  FTC v. Phoebe Putney Health Sys., Inc., 133 S.Ct. 1003, 1010 (2013) (internal quotation marks omitted). Municipalities are not required to show the active-supervision prong of the Midcal test, because, "[w]here the actor is a municipality, there is little or no danger that it is involved

---

[3] The Board repeatedly asserted at oral argument that it is "sovereign" within the meaning of Parker.  The Supreme Court has recognized two entities as "sovereign" under Parker—the state legislature and the state supreme court when "acting legislatively."  Hoover v. Ronwin, 466 U.S. 558, 567-68 (1984)(citing Parker, 317 U.S. at 351 (legislature); and Bates v. State Bar of Arizona, 433 U.S. 350, 360 (1977) (state supreme court)).  The actions of these entities are "ipso facto" exempt from the antitrust laws.  Id. at 568.  It is obvious that a state agency comprised of privately employed dentists is not the "sovereign" equivalent of the state legislature or state supreme court.

in a _private_ price-fixing arrangement." <u>Town of Hallie v. City of Eau Claire</u>, 471 U.S. 34, 47 (1985) (emphasis in original).[4]

The Court's rationale stemmed from the fact that a municipality's conduct is "likely to be exposed to public scrutiny" and "checked to some degree through the electoral process." <u>Id.</u> at 45 n.9. Thus, "at the end of the day a municipality shares the state's 'immunity' when but only when it

---

[4] The <u>Hallie</u> Court also included the following footnote addressing state agencies:

> In cases in which the actor is a state agency, it is likely that active state supervision would also not be required, although we do not here decide that issue. Where state or municipal regulation by a private party is involved, however, active state supervision must be shown, even where a clearly articulated state policy exists.

<u>Town of Hallie v. City of Eau Claire</u>, 471 U.S. 34, 46 n.10 (1985). Relying on this footnote, the Board maintains that, because it is categorized as a state agency by North Carolina, it, too, is not required to show active supervision. This footnote, however, does not bear quite the weight the Board suggests. First, in <u>Southern Motor Carriers Rate Conference, Inc. v. United States</u>, 471 U.S. 48, 57 (1985), issued the same day as <u>Hallie</u>, the Court stated that <u>Midcal</u> continued to define "most specifically" the situations in which "state agencies" were entitled to the <u>Parker</u> exemption. Second, as the FTC explained in rejecting the Board's argument, "the dicta in footnote 10 of <u>Hallie</u> must be reconciled with the Court's other language and reasoning in that same decision," including its discussion of <u>Goldfarb v. Virginia State Bar</u>, 421 U.S. 773 (1975), which we discuss <u>infra</u> at 15-16. <u>Interlocutory Order</u>, 151 F.T.C. at 625. Although we find the dicta in <u>Hallie</u> inapplicable in the instant case, where the "state agency" is composed entirely of private market participants, our opinion should not be read as precluding more quintessential state agencies from arguing that they need not satisfy the active supervision requirement.

is implementing anticompetitive policies authorized by the state." Kay Elec. Coop. v. City of Newkirk, 647 F.3d 1039, 1042 (10th Cir. 2011).

While Parker is available in these three circumstances, in Phoebe Putney the Court cautioned that "given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, 'state-action immunity is disfavored, much as are repeals by implication.'" Phoebe Putney, 133 S.Ct. at 1010 (quoting FTC v. Ticor Title Ins. Co., 504 U.S. 621, 636 (1992)). Thus, "we recognize state-action immunity only when it is clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme that 'is the State's own.'" Id. (quoting Ticor, 504 U.S. at 635).

### B.

In this case, the FTC first held that the Board was a private party required to meet both prongs of Midcal and then concluded that the Board could not show it was actively supervised by North Carolina. The FTC rejected the Board's argument that, as a state agency, it was a substate governmental entity that only had to show its actions were authorized by a clearly articulated state policy. While recognizing that state agencies may, in some instances, fall within Hallie, the FTC found that the "Court has been explicit in applying the

13

antitrust laws to public/private hybrid entities, such as regulatory bodies consisting of market participants" like the Board. Interlocutory Order, 151 F.T.C. at 619. The FTC explained that the "operative factor is a tribunal's degree of confidence that the entity's decision-making process is sufficiently independent from the interests of those being regulated," and that, because a decisive majority of the Board was elected by dentists, it was required to meet the active-supervision requirement. Id. The FTC found this conclusion was supported by the policies underlying the state action doctrine:

> Decisions that are made by private parties who participate in the market that they regulate are not subject to these political constraints unless these decisions are reviewed by disinterested state actors to assure fealty to state policy. Without such review, "there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." Patrick v. Burget, 486 U.S. 94, 101 (1988). Therefore, allowing the antitrust laws to apply to the unsupervised decisions of self-interested regulators acts as a check to prevent conduct that is not in the public interest.

Id. at 622.

Having reached this conclusion, the FTC then easily determined that the Board was not actively supervised because it pointed only to "generic oversight" that did "not substitute for the required review and approval of the 'particular anticompetitive acts' that the complaint challenges." Id. at 630 (quoting Patrick, 486 U.S. at 101).

14

C.

In its petition for review, the Board renews its contention that, as a state agency, it is only required to show clear articulation. Alternatively, the Board contests the FTC's conclusion that its conduct was not actively supervised. We disagree with the Board on both counts.

First, we agree with the FTC that state agencies "in which a decisive coalition (usually a majority) is made up of participants in the regulated market," who are chosen by and accountable to their fellow market participants, are private actors and must meet both Midcal prongs. Phillip E. Areeda & Herbert Hovenkamp, 1A Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 227b, at 501 (3d ed. 2009). See also Einer Richard Elhauge, The Scope of Antitrust Process, 104 Harv. L. Rev. 667, 689 (1991) (concluding that "financially interested action is . . . 'private action' subject to antitrust review"). This result accords with Supreme Court precedent as well as our own.

For example, in Goldfarb v. Virginia State Bar, 421 U.S. 773 (1975), the Court addressed an ethical opinion enforced by the Virginia State Bar Association that required attorneys to abide by a minimum fee schedule. The Bar was a "state agency by law," id. at 790, with the "power to issue ethical opinions,"

15

id. at 791. The Court still denied the Parker exemption to the Bar, concluding that:

> The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members. Cf. Gibson v. Berryhill, 411 U.S. 564, 578-579 (1973). The State Bar, by providing that deviation from County Bar minimum fees may lead to disciplinary action, has voluntarily joined in what is essentially a private anticompetitive activity, and in that posture cannot claim it is beyond the reach of the Sherman Act.

Id. at 791-92.

The key, according to the Goldfarb Court, was that the Parker exemption did not permit the state agency to "foster anticompetitive practices for the benefit of its members." When a state agency and its members have the attributes of a public body—such as a municipality—and are subject to public scrutiny such that "there is little or no danger that [they are] involved in a private price-fixing arrangement," active supervision is not required. Hallie, 471 U.S. at 47. However, when a state agency appears to have the attributes of a private actor and is taking actions to benefit its own membership—as in Goldfarb—both parts of Midcal must be satisfied. Requiring active supervision over such entities ensures "the State has exercised sufficient independent judgment and control so that the details of the [challenged action] have been established as a product of deliberate state intervention." Ticor, 504 U.S. at 634.

16

We have indicated—prior to <u>Midcal</u> and <u>Hallie</u>—that a state agency operated by market participants must show active state involvement. See <u>Asheville Tobacco Bd. of Trade, Inc. v. FTC</u>, 263 F.2d 502, 509 (4th Cir. 1959). In <u>Asheville Tobacco</u>, we addressed conduct by a local board of trade comprised of market participants. The board was "an administrative agency of the State of North Carolina," <u>id.</u> at 508, that was granted the authority under state law to "make reasonable rules and regulations" for selling "leaf tobacco at auction," <u>id.</u> at 505. We found that the board was required to show that it was adequately supervised by the state because, in function, the board was a private actor "organized primarily for the benefit of those engaged in the business." <u>Id.</u> at 509.[5] Of particular relevance was the fact that the officers were appointed from the board's membership and not by the State—a factor also present in this case. <u>Id.</u> at 510. See also <u>Washington State Elec. Contractors Ass'n, Inc. v. Forrest</u>, 930 F.2d 736, 737 (9th Cir. 1991) (noting state regulatory council "may not" qualify as "state agency" because it "has both public and private members, and the private members have their own agenda"); <u>FTC v. Monahan</u>, 832 F.2d 688, 689-90 (1st Cir. 1987) (Breyer, J.) (noting state

---

[5] In reaching this conclusion, we specifically found that we were "not bound by the State court's characterization of the boards." <u>Asheville Tobacco</u>, 263 F.2d at 509.

pharmacy board's status as public or private "depends upon how the Board functions in practice, and perhaps upon the role played by its members who are private pharmacists").[6]

In sum, we agree with the FTC that, as here, when a state agency is operated by market participants who are elected by other market participants, it is a "private" actor. Accordingly, it is required to satisfy both Midcal prongs to obtain the Parker exemption.

D.

Second, having concluded that the Board must satisfy both Midcal prongs, we likewise agree with the FTC that the Board cannot satisfy Midcal's active-supervision prong. In Midcal, the Court found that California did not actively supervise the wine-selling scheme at issue because California law: (1) "simply

---

[6] Although the Board points to several cases concluding that a state agency did not have to demonstrate active supervision, these cases do not create the bright-line rule that the Board requests. See Earles v. State Bd. of Certified Public Accountants of Louisiana, 139 F.3d 1033, 1041 (5th Cir. 1998); Bankers Ins. Co. v. Florida Residential Prop. & Cas. Joint Underwriting Ass'n, 137 F.3d 1293, 1296-97 (11th Cir. 1998); Hass v. Oregon State Bar, 883 F.2d 1453, 1460 (9th Cir. 1989); Gambrel v. Kentucky Bd. of Dentistry, 689 F.2d 612, 620-21 (6th Cir. 1982). Instead, in each case, those courts merely determined that the particular state agency at issue was more akin to a municipality than a private actor. See, e.g., Earles, 139 F.3d at 1041 (noting the "Board is functionally similar to a municipality"); Hass, 883 F.2d at 1460 (review of state provisions left "no doubt that the Bar is a public body, akin to a municipality for purposes of the state action exemption").

18

authorizes price setting and enforces the prices established by private parties"; (2) "neither establishes prices nor reviews the reasonableness of the price schedules"; (3) does not "regulate the terms of fair trade contracts"; (4) and does not "monitor market conditions or engage in any 'pointed reexamination' of the program." Midcal, 445 U.S. at 105–06. The Court reinforced that our national policy in favor of robust competition "cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." Id. at 106. As the Court later noted, "[t]he mere presence of some state involvement or monitoring does not suffice." Patrick, 486 U.S. at 101.

North Carolina has done far less "supervision" in this case than the Court found wanting in Midcal. Here, the cease-and-desist letters were sent without state oversight and without the required judicial authorization. The Board has pointed to certain reporting provisions and "good government" provisions in North Carolina law, but those fall far short of the type of supervision in Midcal that was nonetheless considered deficient. As the FTC explained, "[t]his sort of generic oversight, however, does not substitute for the required review and approval of the 'particular anticompetitive acts'" challenged by the FTC. Interlocutory Order, 151 F.T.C. at 630 (quoting Patrick, 486 U.S. at 101).

19

III.

We next turn to the question of whether the FTC properly found that the Board's behavior violated the FTC Act. The FTC's factual findings are conclusive if supported by substantial evidence, Telebrands Corp. v. FTC, 457 F.3d 354, 358 (4th Cir. 2006), and, while we review legal issues de novo, we "give some deference to the Commission's informed judgment that a particular commercial practice is to be condemned as 'unfair,'" FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 454 (1986). "The [FTC Act] forbids a court to 'make its own appraisal of the testimony, picking and choosing for itself among uncertain and conflicting inferences.'" Id. (quoting FTC v. Algoma Lumber Co., 291 U.S. 67, 73 (1934)).

The FTC Act makes unlawful "[u]nfair methods of competition." 15 U.S.C. § 45(a)(1). In this case, the FTC determined that the Board's conduct violated § 45(a)(1) because it was a violation of § 1 of the Sherman Act, which we have previously recognized is a "species" of "unfair competition." South Carolina Bd. of Dentistry, 455 F.3d at 443 n.7. Accordingly, because the FTC limited its review to whether the Board's conduct violated § 1, we do the same. Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade." 15 U.S.C. § 1. To establish a § 1 antitrust violation, a plaintiff must prove "(1)

20

a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002). Here, the Board challenges both of these requirements, arguing that, under the intracorporate immunity doctrine, see Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984), it is incapable of conspiring with itself, and that, to the extent that doctrine does not apply, the FTC failed to prove a combination or conspiracy that imposed an unreasonable restraint of trade.

A.

Section 1 of the Sherman Act applies "only to concerted action," American Needle, Inc. v. National Football League, 130 S.Ct. 2201, 2208 (2010), and "unilateral conduct is excluded from its purview," Oksanen v. Page Memorial Hosp., 945 F.2d 696, 702 (4th Cir. 1991). In American Needle, the Court recognized that "[a]greements made within a firm can constitute concerted action . . . when the parties to the agreement act on interests separate from those of the firm itself" such that "the intrafirm agreements may simply be a formalistic shell for ongoing concerted action." American Needle, 130 S.Ct. at 2215. See also Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 224 (4th Cir. 2004) (recognizing "independent personal stake exception" to Copperweld). As the American Needle Court

21

explained, "substance," not "form" determines whether an "entity is capable of conspiring under § 1," and the key inquiry is "whether there is a conspiracy between 'separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decision making.'" Robertson v. Sea Pines Real Estate Co., 679 F.3d 278, 285 (4th Cir. 2012) (quoting American Needle, 130 S.Ct. at 2212).

Applying American Needle, the FTC concluded that "Board members were capable of conspiring because they are actual or potential competitors." Final Order, 2011 WL 6229615, at *20. Specifically, the FTC found that "Board members continued to operate separate dental practices while serving on the Board," and that the "Board members had a personal financial interest in excluding non-dentist teeth whitening services" because many of them offered teeth-whitening services as part of their practices. Id. The FTC continued by noting its conclusion was "buttressed by the significant degree of control exercised by dentist members of the Board with respect to the challenged restraints." Id. at *21.

We uphold the FTC's finding that the Board has the capacity to conspire under § 1. As American Needle made clear, concerted action is satisfied when an agreement exists between "separate economic actors" such that any agreement "deprives the

22

marketplace of independent centers of decision making." American Needle, 130 S.Ct. at 2212 (internal quotation marks omitted). The Board members—apart from the consumer member—are active dentists who are required, by the Dental Practice Act, N.C. Gen. Stat § 90-22(b), to be actively engaged in dentistry during their Board tenure. As even the Board's own expert recognized,[7] the Board members' active-service requirement can create a conflict of interest since they serve on the Board while they remain "separate economic actors" with a separate financial interest in the practice of teeth whitening. Cf. Oksanen, 945 F.2d at 706 (noting "a medical staff can be comprised of physicians with independent and at times competing economic interests" and thus "have the capacity to conspire as a matter of law").[8] Any agreement between the Board members thus deprives the market of an independent center of decision making.

---

[7] The Board's expert testified that the Board is concerned about the financial interests of dentists, and that there "is a financial aspect" to the decision to exclude the non-dentist teeth whiteners. (J.A. 580).

[8] The fact that the Board members may have a unity of purpose in the particular restraint at issue—expelling non-dentist teeth whiteners from the market—does not render them incapable of conspiring under § 1, because some "commonality of interest exists in every cartel." Los Angeles Memorial Coliseum Comm'n v. NFL, 726 F.2d 1381, 1389 (9th Cir. 1984). The salient fact is that the Board members, in their private business, remain "separately controlled, potential competitors." American Needle, 130 S.Ct. at 2215.

Moreover, the Board's status as a single entity is not dispositive because "[c]ompetitors 'cannot simply get around' antitrust liability by acting 'through a third-party intermediary or joint venture.'" American Needle, 130 S.Ct. at 2215-16 (quoting Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 336 (2d Cir. 2008) (Sotomayor, J., concurring in judgment)). In Robertson, we rejected the argument that the MLS listing service's status as a "single corporation" rendered it incapable of § 1 conspiracy because it was "comprised of individual real estate brokerages that are separately incorporated and that compete with each other in the sale and purchase of real estate." Robertson, 679 F.3d at 285. Importantly, we found implausible the MLS's contention that the realtors could not violate § 1 because the "individual brokerages acted only in their capacities as MLS board members." Id. at 284. Likewise, in this case the Board's members are separate economic actors who cannot escape liability under § 1 simply by organizing under a "single umbrella." American Needle, 130 S.Ct. at 2212.

B.

Having determined that the Board is capable of conspiring under § 1, we next examine whether the FTC's conclusion that the Board engaged in concerted action is supported by substantial evidence. Of course, concluding that the Board has the capacity

24

to conspire "does not mean, however, that every action taken" by the Board "satisfies the contract, combination, or conspiracy requirement of section one." Oksanen, 945 F.2d at 706. Thus, to be concerted action, the parties must have "a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 768 (1984). We have indicated there must be "something more" than independent action, such as "a unity of purpose or a common design and understanding, or a meeting of the minds." Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc., 878 F.2d 801, 805-06 (4th Cir. 1989). Concerted action may be proven by "direct or circumstantial evidence." Monsanto, 465 U.S. at 768.

The FTC found both direct and circumstantial evidence to support a finding of concerted action. First, the FTC concluded that "[o]n several occasions, the Board discussed teeth whitening services provided by non-dentists and then voted to take action to restrict these services." Final Order, 2011 WL 6229615, at *23. Second, the FTC found a "wealth" of circumstantial evidence to the same effect—members "engaged in a consistent practice of discouraging non-dentist teeth whitening services" through their cease-and-desist letters and other efforts. Id. The FTC found these communications were "similar" and had the "common objective" of closing the market. Id. It

25

was this "consistency" and "frequency" that pointed to concerted action.  Id.  Substantial evidence supports this conclusion.  As the FTC found, several of these letters were sent after votes by the Board, and the lengthy consistent campaign of sending letters and cease-and-desist orders is suggestive of coordinated action.[9]  Accordingly, we agree with the FTC that the Board engaged in a combination or conspiracy under § 1.

IV.

Finally, the Board challenges the FTC's conclusion that its actions amounted to an unreasonable restraint of trade under § 1.  As noted above, we review the FTC's legal conclusion de novo—while giving some deference to its expertise—and we uphold its factual findings if supported by substantial evidence.  Indiana Fed'n of Dentists, 476 U.S. at 454.  We have recognized three forms of analysis for determining if conduct violates § 1: (1) per se; (2) quick-look; and (3) rule of reason.  Continental Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508-09 (4th Cir. 2002).[10]  "The boundaries between these levels of

---

[9] The Board renews its argument—made with regard to the state action doctrine—that enforcement of state law can never be an antitrust conspiracy.  As previously discussed, the Board was acting to regulate third parties in a manner not authorized by state law.

[10] The per se analysis, which "permits courts to make 'categorical judgments' that certain practices, including price fixing, horizontal output restraints, and market-allocation (Continued)

analysis are fluid," and they are "best viewed as a continuum." Id. at 509. "In all cases, however, 'the criterion to be used in judging the validity of a restraint on trade is its impact on competition.'" Id. (quoting National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 104 (1984)).

The rule of reason applies "if the reasonableness of a restraint cannot be determined without a thorough analysis of its net effects on competition in the relevant market." Id. In some instances, an examination short of the rule of reason can be substituted, that is, when a "quick look" indicates the anticompetitive effect of the conduct "but procompetitive justifications . . . also exist." Id. "Rather than focusing upon the category to which a particular restraint should be assigned," Polygram Holding, Inc. v. FTC, 416 F.3d 29, 35 (D.C. Cir. 2005), the "'essential inquiry remains the same—whether or not the challenged restraint enhances competition,'" California Dental Ass'n. v. FTC, 526 U.S. 756, 780 (1999) (quoting Bd. of Regents of University of Oklahoma, 468 U.S. at 104). Application of a quick look is appropriate when "the experience

---

agreements," are per se violative of § 1, is not at issue in this case because the FTC utilized the "quick look" and full rule of reason analysis. Continental Airlines, 277 F.3d at 509 (quoting Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289 (1985)).

of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least a quicker) look, in place of a more sedulous one." Id. at 781. In applying this abbreviated analysis, however, a court "must carefully consider a challenged restriction's possible procompetitive justifications." Continental Airlines, 277 F.3d at 510.

In this case, the FTC determined that the Board's conduct violated § 1 under both a quick-look analysis[11] and a full rule of reason. Final Order, 2011 WL 6229615, at *18 (noting the FTC analyzed the Board's behavior under "the . . . modes of analysis endorsed in Indiana Federation of Dentists," including the quick look approach and the rule of reason). Applying the quick look approach, the FTC first concluded that the conduct was "inherently suspect" because "[t]he challenged conduct is, at its core, concerted action excluding a lower-cost and popular group of competitors," id. at *25, and "[n]o advanced degree in economics is needed to recognize" that the behavior "is likely

---

[11] The FTC referred to the quick look analysis as the "inherently suspect" approach, consistent with its earlier ruling in In re Polygram Holding, Inc., 136 F.T.C. 310 (2003), aff'd Polygram Holding, Inc. v. FTC, 416 F.3d 29 (D.C. Cir. 2005).

to harm competition and consumers, absent a compelling justification," id. at *26.

We affirm the FTC's mode of analysis and find that its conclusion that the Board's behavior was likely to cause significant anticompetitive harms is supported by substantial evidence. See Fashion Originators' Guild of Am., Inc. v. FTC, 312 U.S. 457, 465 (1941) (holding that manufacturer's boycott of certain retailers "has both as its necessary tendency and as its purpose and effect the direct suppression of competition"); Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 294 (1985) (internal quotation marks omitted) (noting "likelihood of anticompetitive effects is clear" in group boycotts involving "joint efforts . . . to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relations the competitors need in the competitive struggle"). The Court has made clear that practices like group boycotts are amenable to the quick look approach—cases in which "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." California Dental, 526 U.S. at 770. It is not difficult to understand that forcing low-cost teeth-whitening

providers from the market has a tendency to increase a consumer's price for that service.[12]

Of note here, the Supreme Court has cautioned that we should be hesitant to quickly condemn the actions of professional organizations because "certain practices by members of a learned profession might survive scrutiny . . . even though they would be viewed as a violation of the Sherman Act in another context." Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 686 (1978). See also Goldfarb, 421 U.S. at 788 n.17 ("The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act."). That is, "[t]he public service

---

[12] The Board argues that FTC failed to consider its justification, that it "acted pursuant to state law," and was "motivated by public protection concerns." (Appellant's Br. at 57). The FTC found that, even assuming these were appropriate justifications for anticompetitive behavior, the Board failed to adduce factual support. The FTC recounted that the Board members pointed to "theoretical" risks of teeth-whitening services without "any clinical or empirical evidence validating" the risks and that the Board could only point to four anecdotal cases of consumer injury "over a multi-year period based on products considered safe by the FDA and used over a million times over the last twenty years." Final Order, 2011 WL 6229615, at *33. The FTC likewise noted the "lack of contemporaneous evidence that the challenged conduct was motivated by health or safety concerns." Id. We find this conclusion supported by substantial evidence.

aspect" of a profession "may require that a particular practice . . . be treated differently." Goldfarb, 421 U.S. at 788 n.17.

The Supreme Court has likewise made pellucid, however, that anticompetitive acts are not immune from § 1 because they are performed by a professional organization. See, e.g., Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 347-51 (1982) (condemning as a per se § 1 violation maximum fee setting agreement by physicians); Indiana Fed'n of Dentists, 476 U.S. at 459-60 (finding horizontal agreement among dentists to be a § 1 violation under quick look analysis). We have also noted, "we are not inclined to condone anticompetitive conduct upon an incantation of 'good medical practice.'" Virginia Acad. of Clinical Psychologists v. Blue Shield of Virginia, 624 F.2d 476, 485 (4th Cir. 1980). In this case, the Board's status as a group of professionals does not condone its anticompetitive practices. Accordingly, we conclude that substantial evidence supports the FTC's factual findings regarding the economic effects of the Board's actions and that those findings support the conclusion that the Board's behavior violates § 1. Indiana Fed'n of Dentists, 476 U.S. at 465-66.

V.

In conclusion, we note that our decision today hardly sounds the death knell for federal/state balance the Board posits. For one, given our conclusion that the Board is a

31

private actor under the antitrust laws, there is no federalism issue. To that end, we note that Board is represented by private counsel and the State has never intervened in the proceedings on the Board's behalf. Cf. Maryland Stadium Auth. v. Ellerbe Beckett, Inc., 407 F.3d 255, 264-65 (4th Cir. 2005) (noting representation by state Attorney General was factor in determining state control). At the end of the day, this case is about a state board run by private actors in the marketplace taking action outside of the procedures mandated by state law to expel a competitor from the market. Despite these actions, if the Board was actively supervised by the State, it would be entitled to the Parker exemption. Today's opinion simply reinforces the Court's admonition that federalism "serves to assign political responsibility, not to obscure it." Ticor, 504 U.S. at 636. As the FTC summarized:

> allowing the antitrust laws to apply to the unsupervised decisions of self-interested regulators acts as a check to prevent conduct that is not in the public interest; absent antitrust to police their actions, unsupervised self-interested boards would be subject to neither political nor market discipline to serve consumers' best interests.

Interlocutory Order, 151 F.T.C. at 622-23.

For the foregoing reasons, the Board's petition for review is denied.

PETITION DENIED

32

BARBARA MILANO KEENAN, Circuit Judge, concurring:

I am pleased to concur in the majority's opinion. I write separately to emphasize the narrow scope of our holding that the North Carolina State Board of Dental Examiners (the Board) is a private actor for purposes of the state action doctrine, and to discuss the practical implications of our decision.

Under the Supreme Court's precedent, private parties are immune from the antitrust laws under the state action doctrine when two criteria are met. See Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980) (Midcal). First, the challenged restraint must be "clearly articulated and affirmatively expressed as state policy," and, second, that policy must be "actively supervised" by the state itself. Id.

In this context, it is useful to state what our opinion does not hold. We do not hold that a state agency must always satisfy the active supervision prong of the standard set forth in Midcal to qualify for antitrust immunity under the state action doctrine. Nor do we hold that a state agency comprised, in whole or in part, of members participating in the market regulated by that state agency is a private actor subject to Midcal's active supervision prong. Instead, our holding that the Board is a private actor for purposes of the state action doctrine turns on the fact that the members of the Board, who are market participants, are elected by other private

participants in the market. <u>See</u> slip op. at 18 ("[W]hen a state agency is operated by market participants who are elected by other market participants, it is a 'private' actor.").

If the Board members here had been appointed or elected by state government officials pursuant to state statute, a much stronger case would have existed to remove the Board from the reach of <u>Midcal</u>'s active supervision prong.[*] <u>See</u> <u>FTC v. Phoebe Putney Health System, Inc.</u>, 133 S. Ct. 1003, 1010 (2013) (holding that municipal and certain "substate" entities of government receive immunity from antitrust scrutiny when they act pursuant to clearly articulated and affirmatively expressed state policy to displace competition, without regard to whether their activities are actively supervised by the state).

---

[*] The separate features supporting the Board's position included: (1) the North Carolina legislature's designation of the Board "as the agency of the State for the regulation of the practice of dentistry in this State," N.C.G.S. § 90-22(b); (2) the designation of Board members as "State employees," N.C.G.S. § 93B-16(b); (3) the Board members' entitlement to sovereign immunity and legal defense by the state attorney general, N.C.G.S. §§ 93B-16(c), 143-300.3; (4) the oath Board members are required to take promising to uphold North Carolina's laws and protect the health, safety, and welfare of the public, N.C. CONST. art. VI, § 7; (5) the potential that Board members may be punished by the North Carolina Ethics Commission if the members act in a manner that presents a conflict of interest, N.C.G.S. §§ 138A-10, 12(o); and (6) the review powers over the Board enjoyed by the North Carolina Joint Legislative Commission on Governmental Operations, which has the power to study state agency activities regarding "conformity with legislative intent," N.C.G.S. § 120-76(1)(d).

I further observe that subjecting the Board to Midcal's active supervision prong does not impose an onerous burden on either the Board or the state. The Supreme Court explained that "the requirement of active state supervision serves essentially an evidentiary function: it is one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy." Town of Hallie v. City of Eau Claire, 471 U.S. 34, 46 (1985) (emphasis added). Accordingly, if a state creates an agency and directs that the members of that agency be selected in a manner similar to the process employed here, the agency may still enjoy antitrust immunity if, for example, the state "monitor[s] market conditions or engage[s] in [a] 'pointed reexamination'" of the agency's actions, Midcal, 445 U.S. at 106, or if the agency's actions have been authorized by the state's judiciary or are subject to judicial enforcement proceedings, Bates v. State Bar of Arizona, 433 U.S. 350, 361-62 (1977).

In this case, I do not doubt that the Board was motivated substantially by a desire to eliminate an unsafe medical practice, namely, the performance of teeth whitening services by unqualified individuals under unsanitary conditions. The Board was aware that several consumers had suffered from adverse side effects, including bleeding or "chemically burned" gums, after receiving teeth-whitening services from persons not licensed to

35

practice dentistry.  Additionally, the Board was aware that many of the "mall kiosks" where such teeth-whitening services are performed lack access to running water.  The Board also received reports that non-licensed persons performed teeth-whitening services without using gloves or masks, thereby increasing the risk of adverse side effects.  Accordingly, in my view, the record supports the Board's argument that there is a safety risk inherent in allowing certain individuals who are not licensed dentists, particularly mall-kiosk employees, to perform teeth-whitening services.

North Carolina is entitled to make the legislative judgment that the benefits of prohibiting non-dentists from performing dental services related to stain removal outweigh the harm to competition that results from excluding non-dentists from that market.  That kind of legislative judgment exemplifies the very basis of the state action immunity doctrine.  However, because "state-action immunity is disfavored," Phoebe Putney, 133 S. Ct. at 1010, when the state makes such a judgment, the state must act as the state itself rather than through private actors only loosely affiliated with the state.

Here, the fact that the Board is comprised of private dentists elected by other private dentists, along with North Carolina's lack of active supervision of the Board's activities, leaves us with little confidence that the state itself, rather

36

than a private consortium of dentists, chose to regulate dental health in this manner at the expense of robust competition for teeth whitening services. Accordingly, the Board's actions are those of a private actor and are not immune from the antitrust laws under the state action doctrine. With these observations, I am pleased to join the majority opinion.