**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 15, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

AURARIA STUDENT HOUSING AT
THE REGENCY, LLC, a Colorado limited
liability company,

     Plaintiff - Appellee,

v.

CAMPUS VILLAGE APARTMENTS,
LLC, a Delaware limited liability company,

     Defendant - Appellant.

--------------------------------------------

NATIONAL ASSOCIATION OF
COLLEGE AND UNIVERSITY
BUSINESS OFFICERS; BOARD OF
GOVERNORS FOR THE COLORADO
STATE UNIVERSITY SYSTEM;
BOARD OF TRUSTEES FOR
COLORADO MESA UNIVERSITY;
BOARD OF TRUSTEES FOR THE
COLORADO SCHOOL OF MINES;
BOARD OF TRUSTEES FOR WESTERN
STATE COLORADO UNIVERSITY,

     Amici-Curiae.

No. 15-1352

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:10-CV-02516-WJM-KLM)**
_____

Daniel D. Domenico, Kittredge LLC, Denver, Colorado (Michael J. Hofmann, Bryan
Cave, LLP, Denver, Colorado, on the briefs), for Defendant-Appellant.

Thomas P. McMahon (G. Stephen Long with him on the briefs), Jones & Keller, P.C., Denver, Colorado, for Plaintiff-Appellee.

Cynthia H. Coffman, Attorney General, Frederick R. Yarger, Solicitor General, Glenn E. Roper, Deputy Solicitor General, Jonathan P. Fero, Assistant Solicitor General, Office of the Attorney General for the State of Colorado, Denver, Colorado, and Marc L. Fleischaker and Brian D. Schneider, Arent Fox LLP, Washington, D.C., filed an amicus brief on behalf of National Association of College and University Business Officers.

—————————————————————

Before **KELLY**, **McKAY**, and **McHUGH**, Circuit Judges.

—————————————————————

**McHUGH**, Circuit Judge.

—————————————————————

## I. INTRODUCTION

This appeal is from a jury verdict finding Campus Village Apartments, LLC (Campus Village) in violation of § 2 of the Sherman Antitrust Act based on its participation in a conspiracy with the University of Colorado-Denver (UCD) to monopolize commerce. Auraria Student Housing at the Regency, LLC (Regency) sued Campus Village after UCD instituted a residency requirement which forced a significant portion of its freshmen and international students to live at Campus Village. Like Regency, Campus Village is an apartment complex located outside the boundaries of the UCD Campus. But the University of Colorado Real Estate Foundation (CUREF) is the sole member of Campus Village, and CUREF operates Campus Village for the benefit of the University of Colorado system. Although Regency alleges that UCD participated in the conspiracy, it named only Campus Village as a defendant in this litigation.

2

On appeal, Campus Village argues principally that the district court erred by not requiring Regency to define the "relevant market" Campus Village allegedly conspired to monopolize. Specifically, it claims recent Supreme Court and Tenth Circuit authority mandate that plaintiffs identify both the relevant geographic and product markets to recover under § 2, including for conspiracy-to-monopolize claims. We agree.

Decades ago, this court determined—based on its reading of the Supreme Court's decision in *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947)—that § 2 conspiracy claims did not require proof of a relevant market. *Salco Corp. v. Gen. Motors Corp.*, 517 F.2d 567, 576 (10th Cir. 1975) (*Salco*). Intervening Supreme Court precedent, however, including *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) (*Spectrum Sports*), provides new guidance for reading *Yellow Cab* and its progeny. With the benefit of this direction, we depart from our decision in *Salco*, and instead hold that plaintiffs must define the relevant market in every § 2 claim. This is true even though a showing of the defendants' power in that market may not be required in some instances.

Regency failed to identify the relevant market here, and Campus Village moved for summary judgment on that basis, among others. Constrained by our decision in *Salco*, the district court held that § 2 conspiracy claims do not require proof of a relevant market, and it denied Campus Village's motion. Ultimately, the case went to the jury and it rendered a verdict in Regency's favor. Because Regency failed to define the relevant market, we vacate the jury verdict. However, in light of

3

our departure from *Salco*, and with the additional guidance provided herein, we remand to the district court to provide Regency with an opportunity to prove the relevant market. We also affirm the district court's rulings on Campus Village's statute of limitations and state action immunity arguments.

## II.  BACKGROUND

### A.  *Factual History*

The facts in this case are largely undisputed. On September 27, 2004, CUREF developed a list of "areas of responsibility" in connection with the planned development of student housing for UCD students. One of the "Expectations of the University" was that it would "[e]nact[] a residency requirement for international students and freshmen from outside the Denver metro area." Two months later, CUREF and UCD entered into a Letter Agreement in which UCD agreed, in more concrete terms, to "institute a residency requirement for all full-time enrolled freshmen at the [UCD] downtown Denver, Colorado campus who reside outside of a radius of 50 miles from the [UCD] downtown Denver, Colorado campus." This residency requirement provided security for the bond offering used to fund the construction of Campus Village, thereby making the offering more appealing to investors. And the parties agree the requirement increased out-of-state student enrollment. It is disputed, however, whether the residency requirement was instituted *for the purpose of* increasing out-of-state freshmen enrollment, retention rates, and student quality of life, or whether it was done purely to assist in the issuance of the bonds.

4

The residency requirement was officially approved on November 22, 2005, to be instituted in Fall 2006.[1] Although the Letter Agreement made mention of a 50-mile exemption for freshmen students, the requirement as promulgated was slightly different. It instead stated: "[UCD] requires all first time [UCD] freshmen under the age of 21 not living with their parent(s) or legal guardian(s), to live in the Campus Village Apartments." But it provided a few exemptions, including for "undergraduate student[s] enrolled for less than 10 credit hours per semester." UCD continued to enforce this requirement and in a 2008 Operating Agreement, "[UCD] agree[d] to continue the implementation and enforcement of its policy requiring first time freshman and international students to reside in the Apartments, subject to the agreed upon exceptions." And UCD specifically advertised that "students may NOT live at the Inn at Auraria or the Regency," two apartment complexes within close proximity to Campus Village.

In 2010, UCD made some changes to the residency requirement. In particular, there was no longer an exemption for students enrolled in fewer than 10 course hours, thereby increasing the number of freshmen students required to live at Campus Village.

---

[1] Regency has suggested that this requirement is particularly egregious because students are notified of the requirement only *after* admission. But although a "handful" of students each year "fell through the cracks" and decided to live at the Regency, there is nothing in the record to suggest that these students did so based on UCD's failure to inform. Rather, UCD publicized the requirement on its website and reached out to all affected students from the requirement's inception.

## B. *Procedural History*

Regency filed its complaint on October 14, 2010, alleging Campus Village conspired with UCD to monopolize commerce, in violation of § 2 of the Sherman Antitrust Act. Regency also raised other claims for relief under Colorado state law, including civil conspiracy and interference with business relations. In turn, Campus Village filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), arguing among other things that Regency's § 2 claim was barred by state action immunity due to UCD's involvement in the project. The district court denied Campus Village's motion to dismiss. Campus Village filed an immediate appeal, which this court dismissed for lack of jurisdiction because it was not from a final order. *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 703 F.3d 1147 (10th Cir. 2013).

Campus Village then filed a motion for summary judgment, characterizing the residency requirement as "simply a tying arrangement," whereby certain consumers of college education at UCD also were required to purchase housing from Campus Village. Campus Village also argued that Regency failed to show harm to competition, as required under § 2, because it had "no evidence that UCD . . . has market power [in the higher education market] or operates in a non-competitive market." Regency denied the challenged conduct was a tying arrangement, arguing that "[a] key difference is that tying requires a relevant market; conspiracy to monopolize does not." The district court denied the motion, treating Campus Village's tying arrangement argument as an unsupported "affirmative defense." Campus Village filed a motion to reconsider, stressing again that the focus of § 2 is

6

on harm to competition, regardless of the nature of the conduct, and that it had "met its burden on summary judgment by pointing out that the plaintiff has no evidence of market power." The district court denied this motion as well, and the case proceeded to trial.

After the close of Regency's case, Campus Village submitted an oral motion under Rule 50(a) for judgment as a matter of law. The district court granted the motion as to Regency's state-law claims, but it denied the motion as to Regency's § 2 claim. In particular, the court found Regency had submitted sufficient evidence of Campus Village's intent to monopolize. It also ruled Regency's § 2 claim was not barred by the four-year statute of limitations, as the "continuing conspiracy" exception applied to reset the limitations period at the beginning of each school year. The court then submitted the case to the jury and it returned a verdict against Campus Village, awarding Regency $3,261,000.00 in damages, which were trebled under 15 U.S.C. § 15(a). Campus Village then filed a motion under Rule 50(b), raising sufficiency of the evidence arguments and renewing its argument that the suit was barred by state action immunity and the statute of limitations. After the district court denied this motion, Campus Village appealed. Exercising jurisdiction under 28 U.S.C. § 1291, we vacate the jury verdict and remand.

## III.  RELEVANT MARKET REQUIREMENT

The district court denied Campus Village's motion for summary judgment despite Regency's failure to define the relevant market in which Campus Village's

7

conduct allegedly harmed competition, and it did so based on this court's prior precedent in *Salco*. We now conclude that the rationale supporting the decision in *Salco* has been undermined by intervening authority from the Supreme Court. We next determine that Regency was required to identify the relevant market to pursue its § 2 conspiracy claim.

In providing our reasoning for this decision, we proceed in two parts. In part one, we determine that identification of the relevant market is required in a conspiracy-to-monopolize claim under § 2. We begin with an overview of the Sherman Act and the evolution of the legal decisions implementing § 2 of that statute. Our discussion explores Supreme Court precedent interpreting what it means under § 2 to monopolize "any part" of commerce, as well as this circuit's attempt to implement those decisions. In particular, we examine the impact of the Supreme Court's opinion in *Spectrum Sports* on our reading of prior authority from the Court, including its decision in *Yellow Cab*. Examining these cases through the lens provided by *Spectrum Sports*, we conclude first that *Yellow Cab* did not dispense with the market requirement in § 2 conspiracy cases. We then pause to examine the treatment of relevant market evidence by other federal circuits in the § 2 context, including their implementation of the *Spectrum Sports* analysis. That review indicates that our interpretation of *Spectrum Sports* is consistent with decisions from the majority of federal circuits to have considered the issue. We then conclude that the requirement of market identification in conspiracy-to-monopolize cases is consistent with the language of § 2 generally, as well as the goals of the Sherman Act.

8

Ultimately, we hold that, after *Spectrum Sports*, the proper reading of § 2 is that plaintiffs must always identify the relevant market, including for conspiracy-to-monopolize claims. Having reached that conclusion, we next consider whether this panel can depart from the circuit's contrary holding in *Salco*. Because the Supreme Court has now adopted reasoning that requires a different result than we reached there, we determine that this panel is not bound by *Salco*.

Proceeding next to part two of this opinion, we conclude that Regency has not properly defined a relevant market. To begin our analysis of this issue, we discuss the method for defining the relevant market under the antitrust laws. We then review the "any part" of commerce identified by Regency and conclude that it does not properly identify the relevant market. However, given our new departure from *Salco*, we remand the case to provide Regency with an opportunity to properly define the relevant market. We also provide further guidance to the district court on remand, including direction on the significance of the nature of the conduct at issue to the § 2 analysis. Accordingly, we vacate the jury verdict and remand for further proceedings consistent with this decision.

**PART ONE: Identification of the Relevant Market is Required in all § 2 Claims**

*A. The Sherman Act*

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 2 makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize

9

any part of the trade or commerce." *Id*. § 2. Importantly, both sections of the Act prohibit only conduct that is harmful to *competition*. Section 1 does so by examining the particular conduct involved to determine whether it is "manifestly anticompetitive," and therefore, per se illegal, or whether, through a rule of reason analysis, it imposes an "unreasonable restraint on competition." *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 50 (1977); *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1203 (10th Cir. 2006). By contrast, § 2 focuses on a narrower class of anticompetitive conduct—that which is monopolistic. And it does so for monopolization and attempt-to-monopolize claims by requiring a showing that a defendant's conduct "actually monopolizes or dangerously threatens to do so." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). With respect to attempt-to-monopolize and conspiracy claims, the statute requires a plaintiff to show that the defendant(s) engaged in conduct with the specific intent "to *monopolize any part* of the trade or commerce." 15 U.S.C. § 2 (emphasis added). And as to conspiracy claims specifically, while the defendants generally must hold some power in the relevant market, the plaintiff need not prove that the conspiracy resulted in a dangerous threat of achieving monopoly power. *See U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 612 n.1 (1977) ("No inference of intent to monopolize [on a § 2 conspiracy claim] can be drawn from the fact that a firm with a small market share has engaged in nonpredatory competitive conduct in the hope of increasing sales.").

10

In sum, plaintiffs raising conspiracy-to-monopolize claims under § 2 must show the existence of a conspiracy, an overt act in furtherance of the conspiracy, and the specific intent to monopolize. And as we demonstrate below, plaintiffs must identify the relevant market they allege the defendants conspired to monopolize—both as a function of the "any part" language of the statute and to show that the aim of the defendants' conduct was "to monopolize." *Id*. If the defendants jointly possess monopoly power within that market, it may be that the "necessary and direct result" of the conduct was monopolization, even if the conduct considered in isolation is not predatory or otherwise competitively unreasonable. *United States v. Griffith*, 334 U.S. 100, 106 (1948), *disapproved of on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984); William C. Holmes, *Conspiracies to Monopolize: A Decisional Model*, 42 Ohio St. L. J. 733, 740–41 (1981). But if the defendants possessed little to no power within the relevant market, the specific nature of their conduct takes on heightened importance and must be considered jointly with the defendants' proposed competitive justifications. But before turning to this issue, we first explain in some detail the Supreme Court's past and present interpretation of the "any part" language from § 2, as it will help contextualize our necessary departure from *Salco*.

11

### B. *From Yellow Cab to Spectrum Sports: The Development of Supreme Court and Tenth Circuit Precedent on the Relevant Market Requirement*

### 1. Yellow Cab

To begin, we must reach back to the Supreme Court's early interpretation of the "any part of . . . commerce" language of § 2 in *United States v. Yellow Cab Co.*, a case in which the government filed suit against several taxicab companies, claiming they had conspired to monopolize the markets for (1) the sale, and (2) the operation of taxicabs. 332 U.S. 218, 225–26 (1947), *overruled on other grounds by Copperweld*, 467 U.S. 752. The Court made two relevant observations of the "any part" language from § 2. First, it noted that § 2 does not "specify[] how large a part [of the trade or commerce] must be affected," and it then concluded that a plaintiff need only allege that "some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy." *Id*. at 225. Second, the Court found to be "irrelevant" the "importance of the interstate commerce affected in relation to the entire amount of that type of commerce in the United States." *Id*. at 226. In light of these observations, especially the Supreme Court's conclusion that a party need only allege an impact on "some *appreciable* part of interstate commerce," *id*. at 225 (emphasis added), a number of courts questioned whether plaintiffs raising § 2 conspiracy claims must define a relevant market, as opposed to simply alleging an impact on a quantifiable amount of interstate commerce.

### 2. *Salco* and its Progeny

In 1975, this court answered that question in the negative. *Salco Corp. v. Gen. Motors Corp.*, 517 F.2d 567 (10th Cir. 1975). In *Salco*, we interpreted *Yellow Cab* to specifically dispense with a relevant market requirement for § 2 conspiracy claims. Like the Supreme Court in *Yellow Cab*, we focused on the scope of the "any part" language and explained:

> Section 2 makes it unlawful to conspire to monopolize "any part" of interstate commerce. Specific intent to monopolize is the heart of a conspiracy charge, and a plaintiff is not required to prove what is the "relevant market." It is enough if "'some appreciable part of interstate commerce is the subject' of the conspiracy."

*Id.* at 576 (quoting *Yellow Cab*, 332 U.S. at 225–26). And this circuit consistently ruled for decades after *Salco* that § 2 conspiracy claims do not require proof of a relevant market. *See, e.g.*, *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1024 n.10 (10th Cir. 2002) (vertical merger and leveraging); *Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n. of Kan.*, 891 F.2d 1473, 1484 (10th Cir. 1989) (tying arrangement); *Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 438 (10th Cir. 1983) (price-fixing, boycott, and exclusive dealing allegations); *Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1377 (10th Cir. 1979) (exclusionary conduct).

Based on subsequent authority from the Supreme Court, however, this court has since questioned *Salco*'s reasoning. In *Lantec*, we recognized a circuit split on whether proof of the relevant market is required to support a § 2 conspiracy claim. 306 F.3d at 1024 n.10. But in light of *Salco*, and because the parties had not argued

13

that intervening authority indicated proof of a relevant market should be required, the panel in *Lantec* decided "not [to] revisit [the] rule." *Id*. More recently, we seem to have deviated from *Salco*. The panel in *Campfield v. State Farm Mutual Auto Insurance Co.*, without distinguishing between the plaintiff's conspiracy-to-monopolize and monopoly claims under § 2, and without mentioning either *Salco* or the Supreme Court's then-recent decision in *Spectrum Sports*, explained, "To state a cause of action for conduct prohibited under § 2 of the Sherman Act, the plaintiff must define a relevant market within which the defendants allegedly engaged in anticompetitive behavior." 532 F.3d 1111, 1117 (10th Cir. 2008). The panel then went on to hold that, "By failing to allege an appropriate market, Mr. Campfield has failed to state a claim under § 2 of the Sherman Act." *Id.* at 1119.

But even if *Campfield* can be read to require proof of a relevant market for § 2 conspiracy claims, we are still faced with a contrary determination in *Salco*. And "when faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom." *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 n.1 (10th Cir. 1999) (citation omitted). This would appear to be the end of our inquiry, as a three-judge panel is bound to follow circuit precedent. *United States v. Spedalieri*, 910 F.2d 707, 710 n.3 (10th Cir. 1990). But an exception to our rule exists where the Supreme Court has subsequently issued a decision that undermines our prior precedent. *United States v. Hathaway*, 318 F.3d 1001, 1006 (10th Cir. 2003). Just such a decision exists here.

14

### 3. Spectrum Sports

In 1993, the Supreme Court decided *Spectrum Sports*, which again addressed the scope of the "any part" language in § 2. There, the Supreme Court reversed the Ninth Circuit's holding that a plaintiff raising a § 2 attempt-to-monopolize claim need not define a relevant market or show the defendant's power in that market. 506 U.S. at 459–60. The Ninth Circuit had relied on its earlier decision in *Lessig v. Tidewater Oil Co.*, which held that a relevant antitrust market is "not in issue" in attempt and conspiracy cases because "Section 2 prohibits attempts to monopolize 'any part' of commerce, and a dominant position in the business . . . was not necessarily prerequisite to ability to attempt to monopolize an appreciable segment of interstate sales." 327 F.2d 459, 474–75 (9th Cir. 1964), *abrogated by Spectrum Sports*, 506 U.S. 447. *Lessig*, like *Salco*, relied on a reading of *Yellow Cab* that deemed the alleged monopolist's relative power in the market irrelevant, so long as anticompetitive activity affects "an appreciable segment of interstate sales." *Id.* at 475 & n.48 (citing *Yellow Cab*, 332 U.S. at 226).

In rejecting *Lessig*'s interpretation of § 2, the Supreme Court clarified that its decision in *Yellow Cab* "relied on the 'any part' language to support the proposition that it is immaterial how large an amount of interstate trade is affected, or how important that part of commerce is in relation to the entire amount of that type of commerce in the Nation." *Spectrum Sports*, 506 U.S. at 457 n.9. That is, whether activity falls within the *interstate commerce* reach of the Sherman Act is based on the interstate character of the commerce, not on the actors' share of a particular interstate

15

market. Thus, *Lessig*'s reliance on *Yellow Cab* as support for the idea that a defendant's relative power in the market is irrelevant to other elements of a § 2 claim was misplaced. Turning to the language of the Sherman Act, the Court in *Spectrum Sports* explained that the "any part" clause in § 2 "applies to charges of monopolization as well as to attempts to monopolize, and it is beyond doubt that the former requires proof of market power in a relevant market." *Id.* at 457. It accordingly reversed the Ninth Circuit decision and held that proof of power in a relevant market is necessary to establish the dangerous probability of success element of a § 2 attempt-to-monopolize claim.

Although *Spectrum Sports* does not expressly address § 2 conspiracy-to-monopolize claims and such claims do not require a dangerous probability of success, it nevertheless undermines our decision in *Salco* in three ways. First, *Spectrum Sports* clarifies that *Yellow Cab* did not deem market identification to be irrelevant to § 2 issues generally, thereby demonstrating that *Salco*'s reliance on *Yellow Cab* in support of that proposition was misplaced.[2] Second, the Court's plain language reading of the statute applies with equal force to conspiracy claims. Recall that § 2 makes it unlawful for any person to "monopolize, or attempt to monopolize, or

---

[2] *Salco* also cited *United States v. Consolidated Laundries Corp.*, 291 F.2d 563 (2d Cir. 1961). However, *Consolidated Laundries* also traces its rule back to *Yellow Cab. Id.* at 573 ("But where the charge is conspiracy to monopolize, the essential element is not the power, but the specific intent, to monopolize. Section 2 makes it unlawful 'to conspire to monopolize "any part" of interstate commerce, without specifying how large a part must be affected. Hence it is enough if some appreciable part of interstate commerce is the subject' of the conspiracy." (quoting *Yellow Cab*, 332 U.S. at 225–26)).

16

combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2. The Court noted that "[t]he 'any part' clause . . . applies to charges of monopolization as well as to attempts to monopolize, and it is beyond doubt that the former requires proof of market power in a relevant market." *Spectrum Sports*, 506 U.S. at 457. As is evident from the text of the statute, the "any part" language also applies to conspiracy-to-monopolize claims. It is equally apparent, then, that the "any part" language does not excuse a plaintiff in a conspiracy-to-monopolize case from identifying the relevant market. Third, *Spectrum Sports* reiterates that § 2 forbids only conduct which is truly anticompetitive:

> The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.

506 U.S. at 458. To determine whether conduct is anticompetitive, of course, generally requires reference to the impact of that conduct on the relevant market. *See NYNEX Corp. v. Discon, Inc*., 525 U.S. 128, 139 (1998) (explaining that unless the defendants' actions "*harmed the competitive process*, they did not amount to a conspiracy to monopolize" (emphasis added)). And we have said as much in cases post-dating both *Salco* and *Lantec*. *See, e.g.*, *Gregory*, 448 F.3d at 1206 ("Because the [plaintiffs] fail to establish that the [defendant's] challenged conduct harmed the competitive process under § 1, their conspiracy to monopolize claim under § 2 likewise fails.").

17

### 4. *Yellow Cab* Revisited

When examined through the lens provided by the Supreme Court in *Spectrum Sports,* the decision in *Yellow Cab* cannot sustain a reading that dispenses with market identification in conspiracy-to-monopolize cases. This new perspective on *Yellow Cab* also harmonizes it with prior and subsequent Supreme Court precedents that clarify the scope of the "any part" language from § 2. And it is consistent with the goals of the antitrust laws.

As discussed, the Supreme Court's statement in *Yellow Cab* that only an "appreciable part" of commerce need be affected by the conspiracy was made in response to the suggestion that the Sherman Act reached only conduct that had affected a quantifiable threshold "amount" of commerce in the whole United States. 332 U.S. at 225 (noting that § 1 "outlaws unreasonable restraints on interstate commerce, regardless of the amount of commerce affected" and § 2 "makes it unlawful to conspire to monopolize 'any part' of interstate commerce, without specifying how large a part must be affected"). The Court explained that it is enough to satisfy the interstate prerequisite "if some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy," because the focus of both sections is on the interstate character of the defendant's conduct, rather than the "amount" of commerce thereby affected. *Id*. Thus, when the Court in *Yellow Cab* declared "irrelevant" the size of the affected part of interstate commerce in relation to the entire volume of that type of commerce nationwide, it meant for purposes of establishing the interstate character of the affected commerce. *Id.* at 226.

Further support for a reading of *Yellow Cab* that does not dispense altogether with the relevant market requirement is its direction that such "parts" of commerce can be distinguished from the whole by reference to the "geographical and distributive significance" of §§ 1 and 2, a phrase it drew from its prior decision in *Standard Oil*. *See id.* at 226 (quoting *Ind. Farmer's Guide Publ'g Co. v. Prairie Farmer Publ'g Co.*, 293 U.S. 268, 279 (1934)). There, the Supreme Court explained:

> The commerce referred to by the words "[any] part," construed in the light of the manifest purpose of the statute, has both a geographical and a distributive significance; that is, it includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce.

*Standard Oil Co. of N.J. v. United States,* 221 U.S. 1, 61 (1911). In other words, and as *Spectrum Sports* now underscores, when § 2 uses the phrase "any part" of commerce, it is referring both to a geographic market and a distributive (or product) market—i.e., it is referring to the "relevant market." *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956) (expounding on the contours of the relevant market requirement under § 2); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 893 (10th Cir. 1991) ("[T]he plaintiff must prove . . . [the] relevant market (including geographic market and relevant product market) in which the alleged [antitrust violation] occurred." (internal quotation marks omitted)).

And although the discussion in *Yellow Cab* made no mention of the "specific intent to monopolize" element of § 2 conspiracy claims, the Court later explained that market power may have bearing on this element, particularly where a defendant's conduct cannot be viewed as predatory. *See U.S. Steel Corp. v. Fortner Enters., Inc.*,

429 U.S. 610, 612 n.1 (1977) ("No inference of intent to monopolize [on a § 2 conspiracy claim] can be drawn from the fact that a firm with a small market share has engaged in nonpredatory competitive conduct in the hope of increasing sales."). In summary, based on the elucidation provided by the Court in *Spectrum Sports*, we conclude that *Salco*'s reading of *Yellow Cab* to eliminate a relevant market requirement for conspiracy claims under § 2 is flawed, and that the "any part" language in the statute does not dispense with the need to do so.[3]

### C. *This View is Consistent with the Language and Purpose of the Statute and the Conclusion of the Majority of Circuits to Consider the Issue*

### 1. The Language and Goals of the Sherman Act

A requirement that the plaintiff identify the relevant market to support all § 2 claims gives full effect to the language of the Sherman Act. First, it provides a consistent interpretation of the "any part" language, and it incorporates the

---

[3] The Supreme Court's decision in *United States v. Grinnell Corp*., 384 U.S. 563 (1966), reinforces this point by reading the "any part" language in the Act as a reference to the relevant market requirement. In *Grinnell*, the government charged several alarm and protective services businesses with violations of §§ 1 and 2 of the Sherman Act. The district court accepted the market definition of "the accredited central protective service business," which was a conglomeration of the defendants' services. *See United States v. Grinnell Corp*., 236 F. Supp. 244, 249 (D.R.I. 1964), *aff'd in part, rev'd in part*, 384 U.S. 563 (1966). The defendants challenged that market definition on certiorari, but the Supreme Court affirmed. The Court explained that the market for reasonably interchangeable goods "make[s] up that 'part' of trade or commerce which § 2 protects against monopoly power." *Id*. at 571. In other words, the "any part" language from § 2 speaks to the relevant market (reasonably interchangeable goods), and is not simply a requirement that a defendant's actions impact some appreciable amount of interstate commerce. Although the Court made this statement in describing the elements of "[t]he offense of monopoly under § 2," *id*. at 570, it affirmed the district court's definition of the relevant market as to all of the government's § 2 claims, including conspiracy. *See id*. at 570–73; 236 F. Supp. at 257.

geographic and distributive significance of the Act. It is also consistent with § 2's focus on monopolization. Recall that none of the offenses under § 2, including attempt and conspiracy, penalize anticompetitive conduct in the abstract. Rather, the statute makes it illegal to "*monopolize*, or attempt to *monopolize*, or combine or conspire with any other person or persons, to *monopolize*" a part of commerce. 15 U.S.C. § 2. As the leading antitrust treatise explains:

> [T]he statutory language itself focuses on "monopolize," and "monopoly" in common usage and in common law refers to control over a distinct trade or calling—that is, to an economic market. The very concept of "monopoly" so implies. Thus, "any part of . . . trade or commerce" can and should be read as referring to markets in the economic sense.

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 802b (4th ed. 2015); Janis L. Harwell, Comment, *The Relevant Market Concept in Conspiracy to Monopolize Cases Under Section 2 of the Sherman Act*, 44 U. Chi. L. Rev. 805, 809 (1977) ("The relevant market requirement derives not from the 'any part' language of section 2 but rather from the term 'monopolize.'"); *see Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 257 (3d Cir. 2010) (explaining that a defendant must have "intended to achieve an illegal monopoly" (citation omitted)).

Second, requiring identification of the relevant market furthers the goals of the statute by ensuring that joint conduct is proscribed only when it is anticompetitive. Viewed without the context of a relevant market, a § 2 conspiracy-to-monopolize claim could be used to target conduct deemed pro-competitive under § 1:

> Where the agreements involved would also be held to offend §1 without the necessity of proving [market] power, the failure to require it for the

21

§2 conspiracy offense is understandable. However, in those instances where power is a prerequisite to holding an agreement to be an unreasonable restraint of trade . . . it would make no sense to hold the same agreement offensive to §2 without proof of power. To require power under §1 before condemning a particular agreement is necessarily to say that the arrangement is socially desirable, or at least not harmful, in the absence of power. That policy conclusion cannot sensibly be avoided or negated by the simple trick of calling the agreement a conspiracy to monopolize.

Areeda & Hovenkamp ¶ 809; *see also id*. ¶ 802b (reading the "any part" language to encompass any aggregation of sales would "condemn[] every improper act by powerless actors as monopolization" and "would produce surprising and undesirable results that would make no policy sense today and that were not within congressional contemplation"); *accord Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002). As we explain in more detail below, this danger becomes particularly acute where, as here, a plaintiff raises *only* a § 2 conspiracy claim in a likely attempt to obviate the market analysis that would be required for the same conduct under § 1.

To avoid that result, we follow the Supreme Court's rationale in *Spectrum Sports* and conclude that plaintiffs must define the relevant market in every § 2 claim, including conspiracy-to-monopolize claims. *See* 506 U.S. at 458 ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."); *Gregory*, 448 F.3d at 1206 ("Because the [plaintiffs] fail to establish that the [defendant's] challenged conduct harmed the competitive process under § 1, their conspiracy to monopolize claim under § 2 likewise fails."); *Lantec*, 306 F.3d at 1030 (concluding that "obvious pro-competitive justification[s]" for firm's conduct precluded the court from finding

22

a conspiracy to monopolize). As we explain below, proof of the defendants' power in that market may not be required where their conduct is predatory or competitively unreasonable. But even in those instances, the specific intent to monopolize must be assessed in the context of the target market.

## 2. Most Circuits Share this View

A clear majority of federal circuits have required plaintiffs raising conspiracy claims under § 2 to identify the relevant market. And an increasing number have done so in response to the Supreme Court's decision in *Spectrum Sports*.[4] There is some variation, however, in implementation of this market requirement.

First, at least nine circuits have required either that plaintiffs define the relevant market as a necessary element of a § 2 conspiracy claim, or that they identify, in a less rigorous fashion, the geographic and product context in which the conspiracy was alleged to have operated.[5] Second, the Supreme Court and at least six

---

[4] *See* Earl W. Kintner et al., *Federal Antitrust Law* § 16.39 (2d ed. 2015) ("[A]fter the Supreme Court's decision in *Spectrum Sports*, the better reasoned decisions have concluded that at least a dangerous probability of acquiring monopoly power is required in conspiracy cases."); Julian O. von Kalinowski et al., *Antitrust Laws & Trade Regulation* § 26.02 (2d ed. 2015) (requiring no proof of the relevant market "is questionable given the Supreme Court's decision in *Spectrum Sports*").

[5] **First Circuit:** *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 68 (1st Cir. 2002) ("Although we lean toward [requiring proof of a relevant market] as a general matter, a black or white rule is not inevitable: there may in principle be some cases in which one could argue that a conspiracy claim should be provable without a showing that the alleged market is a real economic market. This case is not among them."); **Second Circuit:** *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (affirming dismissal of § 2 conspiracy claim where "plaintiffs' proposed relevant market d[id] not encompass all interchangeable substitute products"); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (explaining, under a § 2 conspiracy claim, "[i]ntent alone is

circuits appear to view market identification as necessary to the extent it enables the

court to assess whether a defendant's non-predatory conduct truly causes harm to

competition.[6] Third, the Supreme Court and at least two circuits have concluded that

---

not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one" (citing *Spectrum Sports*, 506 U.S. at 455–56)); **Third Circuit:** *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 877 (3d Cir. 1995) ("Market power may be relevant in some Sherman Act section 1 claims but it is an essential factor to be considered in all Sherman Act section 2 claims."); **Fourth Circuit:** *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) ("[W]ithout allegations regarding the market power or share of Compaq or Dell in the PC market, Gravity is unable to show a conspiracy to monopolize under § 2."); **Fifth Circuit:** *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 311 (5th Cir. 1997) ("To establish Section 2 violations premised on attempt and conspiracy to monopolize, a plaintiff must define the relevant market."); **Sixth Circuit:** *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 318 (6th Cir. 2015) ("Conspiracy to monopolize entails proof of concerted activity, but, like the other two § 2 claims, requires an initial identification of the relevant markets." (internal quotation marks omitted)); **Eighth Circuit:** *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1182, 1193 (8th Cir. 1982) ("It is generally held that relevant market is not a necessary element of [conspiracy] claim[s] because actual attainment or 'dangerous probability' of monopoly power are not at issue. In our view, a minimal showing must nonetheless be made as to the product and geographic context of the alleged conspiracy. . . . It need not be as rigorous as the relevant market showing for other Section 2 claims . . . ." (citation omitted)); **Eleventh Circuit:** *Compare Bill Beasley Farms, Inc. v. Hubbard Farms*, 695 F.2d 1341, 1343 (11th Cir. 1983) ("In this circuit it is clear that relevant market is a necessary element of a conspiracy to monopolize."), *with Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1556 (11th Cir. 1996) ("A claim for conspiracy to monopolize, on the other hand, does not require a showing of monopoly power."); **D.C. Circuit:** *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418, 420 (D.C. Cir. 1957) ("[T]here is no evidence of any attempt or conspiracy to create a monopoly, since there is no evidence of any attempt to get control of the relevant market.").

[6] **Supreme Court:** *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) (explaining that unless a defendants' actions "*harmed the competitive process*, they did not amount to a conspiracy to monopolize" (emphasis added)); **Second Circuit:** *Elecs. Commc'ns Corp.*, 129 F.3d at 246 ("We reject ECC's section 2 [conspiracy] claim for substantially the same reasons outlined in our discussion of ECC's section 1 claim. The agreement . . . cannot harm competition, and therefore cannot serve to

24

a defendant's lack of power in the relevant market bears on whether the conspirators

harbored the specific intent to monopolize, particularly where an inference of specific

intent cannot be gleaned—or at the very least is *difficult* to glean—from the character

of the defendant's conduct.[7] The minority position, to which we formerly subscribed,

further an alleged monopolization scheme."); **Fourth Circuit:** *Dickson*, 309 F.3d at 211 ("The offense of monopolization requires a showing of 'anticompetitive effect.' Thus, a viable § 2 conspiracy to monopolize claim must include allegations which, if proven true, would establish that the agreements Compaq and Dell made with Microsoft could have had an anticompetitive effect." (citations omitted)); **Ninth Circuit:** *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (relying on its rule of reason (and thereby relevant market) analysis to find a lack of antitrust injury: "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury. As we explained in our rule of reason analysis above, the procompetitive benefits of MPC's five-year transportation assignments outweighed any anticompetitive harm they might have caused" (citation omitted)); *id.* at 1156 ("The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects. We review all the facts, including the precise *harms alleged to the competitive markets*, and the legitimate justifications provided for the challenged practice, and we determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects." (footnote omitted and emphasis added)); **Eleventh Circuit:** *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993) ("The elements of a conspiracy to monopolize under Section 2 are (1) an agreement to restrain trade, (2) deliberately entered into with the specific intent of achieving a monopoly rather than a legitimate business purpose, (3) which could have had an anticompetitive effect, and (4) the commission of at least one overt act in furtherance of the conspiracy."); **D.C. Circuit:** *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (holding, within discussion on court's subject-matter jurisdiction, that "[a] would-be monopolist or member of a conspiracy to monopolize comes within the condemnation of the Sherman Act when it engages in 'anticompetitive conduct'" (quoting *Spectrum Sports*, 506 U.S. at 456)); **Fed. Circuit:** *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1363–64 (Fed. Cir. 1999) (requiring proof of the relevant market in order to show harm to competition on a § 2 conspiracy claim).

[7] **Supreme Court:** *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 612 n.1 (1977) (finding lack of specific intent to monopolize for a § 2 conspiracy claim: "No inference of intent to monopolize can be drawn from the fact that a firm with a small market share has engaged in nonpredatory competitive conduct in the hope of

is that proof of a relevant market is *not* required for § 2 conspiracy claims, given the interpretation of the "any part" language from *Yellow Cab*.[8]

Although these decisions from our sister circuits are not controlling, they inform our analysis here. And they give us greater confidence in our conclusion that the analysis in *Spectrum Sports* indicates that a plaintiff must identify the relevant market to make out a conspiracy-to-monopolize claim under § 2. The market definition is relevant to the conspirators' intent to monopolize and to whether the conduct harmed competition.

---

increasing sales."); **Second Circuit:** *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1144 (2d Cir. 1975) ("[I]t is patently obvious that the defendants had no power to control either market. Although specific intent to monopolize, and not monopoly power, is the essential element when a conspiracy to monopolize is involved, the absence of any likelihood of success is certainly some evidence on the question of whether such specific intent existed. And here the futility of any effort to monopolize either submarket as shown by the evidence referred to above, coupled with the repeated denials of the defendants, amply supports the finding of the district court [that no specific intent existed]." (citation omitted)); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016) ("[W]hile rigorous proof of a relevant market and of a dangerous probability of achieving monopoly power are not, in this Circuit, essential elements of conspiracy to monopolize, the relevant market and the likelihood of its monopolization may have a significant bearing on whether the requisite specific intent to monopolize is present." (internal citation omitted)); **Ninth Circuit:** *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926, 927 (9th Cir. 1980) ("[N]o particular level of market power or 'dangerous probability of success' has to be alleged or proved in a conspiracy claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken. . . . But where actions are ambiguous, the existence and extent of market power may make the inference of specific intent from conduct more or less plausible.").

[8] *See, e.g.*, **Second Circuit:** *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961); **Seventh Circuit:** *United States v. Nat'l City Lines*, 186 F.2d 562, 566–68, 573 (7th Cir. 1951).

**D. *This Panel is not Bound by* Salco**

Having concluded that current guidance from the Supreme Court indicates that § 2 plaintiffs must identify the relevant market, we now consider whether *Spectrum Sports* constitutes "intervening" precedent sufficient to justify this panel's departure from *Salco*. Regency argues that *Spectrum Sports* is not "intervening" precedent because *Lantec*, which Regency claims reaffirmed *Salco*, was decided after *Spectrum Sports*. But the panel in *Lantec* never mentioned *Spectrum Sports*, so the fact that *Lantec* was decided after *Spectrum Sports* is of no moment. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925); *Merrifield v. Bd. of Cty. Comm'rs for Cty. of Santa Fe*, 654 F.3d 1073, 1084 (10th Cir. 2011) ("It is elementary that an opinion is not binding precedent on an issue it did not address."). *Lantec* therefore lacks any precedential effect on the question of *Salco*'s continued validity after *Spectrum Sports*. As a result, we undertake initial consideration of that issue here.

Weighing against the significance of *Spectrum Sports* on this issue is the fact the Court there discussed attempt-to-monopolize claims, without expressly addressing conspiracy-to-monopolize claims. On the other hand and contrary to Regency's position, the Court's analysis applies to § 2 claims generally. As we have explained, the Court in *Spectrum Sports* elucidates the "collective message" of *Yellow Cab* and its progeny, such that those cases no longer support our analysis in *Salco*. As a result, we may depart from *Salco*—at least to the extent that it omits

27

identification of the relevant market from the elements necessary to prove a conspiracy-to-monopolize claim under § 2. *Compare Barnes v. United States*, 776 F.3d 1134, 1147 (10th Cir. 2015) (refusing to overrule prior precedent from our circuit because the "collective message" from intervening, related Supreme Court authority was not "so indisputable and pellucid . . . that it constitutes intervening (i.e., superseding) law that would permit us to hold (without en banc consideration)" to the contrary), *cert. denied*, 136 S. Ct. 1155 (2016), *with United States v. Brooks*, 751 F.3d 1204, 1209–10 (10th Cir. 2014) ("The question, however, is not whether an intervening Supreme Court case is on all fours with our precedent, but rather whether the subsequent Supreme Court decision *contradicts* or *invalidates* our prior analysis.").

In summary, when read with the advantage of the Court's *Spectrum Sports* decision, Supreme Court precedents, including *Yellow Cab*, reject a reading of § 2 that dispenses with the need to identify the relevant market for conspiracy claims. These precedents undermine the rationale of our decision in *Salco* and warrant our retreat from its holding. Accordingly, we depart from *Salco* now and instead hold that a plaintiff asserting a conspiracy-to-monopolize claim must identify the market the defendants allegedly conspired to monopolize.

**E.  *While Identification of the Relevant Market is Necessary, Showing the Defendant's Relative Power Within that Market May Not Always be Required***

Our holding that a § 2 plaintiff must identify the relevant market does not mean that in every instance proof of the defendant's power in that market is also

28

necessary. As discussed, § 2 conspiracy claims require a different showing than is required for § 2 monopolization and attempt claims. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 789 (1946) (explaining, in the context of a § 2 conspiracy to monopolize claim, that "a conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy" (internal quotation marks omitted)). Monopolization and attempt claims under § 2 require proof that a defendant's conduct "actually monopolizes or dangerously threatens to do so." *Spectrum Sports*, 506 U.S. at 459. In contrast, defendants might be "convicted . . . of a conspiracy to monopolize without ever having acquired the power to carry out the object of the conspiracy, i.e., to exclude actual and potential competitors" from the relevant market. *Am. Tobacco Co.,* 328 U.S. at 789. But the Supreme Court has also explained that, "[n]o inference of intent to monopolize can be drawn from the fact that a firm with a small market share has engaged in nonpredatory competitive conduct in the hope of increasing sales." *U.S. Steel Corp.*, 429 U.S. at 612 n.1.

So, while it may not be necessary for plaintiffs in § 2 conspiracy claims to establish that defendants possess a dangerous level of market power, *identification* of the market is still necessary. *See Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1020 (10th Cir. 1998) ("[M]arket definition [in antitrust law] . . . is not an end unto itself but rather exists to illuminate a practice's effect on competition."). If the defendants jointly possess monopoly power within that market, it may be that the "necessary and direct result" of their conduct was monopolization, even if the conduct considered in isolation is not predatory or otherwise competitively

29

unreasonable. *Griffith*, 334 U.S. at 106. But if the defendants possessed little to no power within the relevant market, the nature of their conduct takes on heightened importance and must be considered jointly with the defendants' proposed competitive justifications for their actions.

For example, in *American Tobacco* the Supreme Court readily determined that the defendants (several major American cigarette producers, among others) conspired to monopolize commerce, given their dominant control over the national cigarette market, and in light of the nature of their conduct, which included horizontal price fixing. 328 U.S. at 795–96. By contrast, in a case involving a tying arrangement with claims under both § 1 and § 2, the Supreme Court found on the plaintiffs' § 2 conspiracy claim that the defendants' lack of power in the market for the tying product (credit) tended to negate their specific intent to monopolize the market for the tied product (prefabricated houses). *See U.S. Steel Corp.*, 429 U.S. at 612 & n.1. Because the defendants' market power was lacking, the nature of their conduct (a tying arrangement) took on a more prominent role; and the Court determined the tying arrangement was lawful because it was used not for monopolistic goals but rather for permissible competitive purposes under § 2, such as "increas[ing] sales of prefabricated house packages" and "increas[ing] the share of the market." *Id*. at 612 n.1.

In summary, to prove a conspiracy to monopolize, a plaintiff must show the existence of a conspiracy, an overt act in furtherance of the conspiracy, and the specific intent to monopolize a relevant market. In this sense, our approach differs

30

somewhat from the First Circuit, which "lean[s] toward [requiring proof of a relevant market] as a general matter" but does not view "a black or white rule [as] inevitable." *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 68 (1st Cir. 2002). In their view, "there may in principle be some cases in which one could argue that a conspiracy claim should be provable without a showing that the alleged market is a real economic market." *Id.* As explained, we agree that a plaintiff may not need to establish a threshold level of market *power* in some instances, but conclude that *identification* of the relevant market is required for all § 2 conspiracy claims. Such a result is compelled by the "any part" language of the statute as explained in *Spectrum Sports*, but it is compelled even more so by the requirement that the conspiracy is aimed at *monopolization*—an inquiry that cannot be conducted in a vacuum. *See* Areeda & Hovenkamp ¶ 802b.

**PART TWO: Regency Has Failed to Identify a Relevant Market**

The district court denied Campus Village's motion for summary judgment in reliance on our holding in *Salco* that a plaintiff need not identify the relevant market to prove a conspiracy-to-monopolize claim. We have now departed from that position based on the Supreme Court's further guidance in *Spectrum Sports*. Therefore, we must consider whether Campus Village's motion for summary judgment should have been granted. Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as matter of law. Fed. R. Civ. P. 56(a). In considering a denial of summary judgment, "we review the district court's conclusions of law de novo, and construe the record in the light most

31

favorable to the party opposing summary judgment." *See Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 367 (10th Cir. 1993).

According to Regency, it has met its burden under § 2 by defining the "part of commerce" affected by the defendants' conduct. We are not persuaded. In providing our reasoning for that conclusion, we first explain how the boundaries of a relevant market are identified under the antitrust laws and how Regency failed to implement those principles here. But because Regency reasonably relied on our prior authority that it need not identify the relevant market, we remand the case with guidance to the district court to provide Regency a fair opportunity to do so now. In particular, we explain the importance of identifying the nature of the alleged anticompetitive conduct in considering a plaintiff's § 2 conspiracy-to-monopolize claim. This in turn appropriately focuses the inquiry on the plaintiff's burden to establish that the defendants acted with the specific intent to *monopolize*, which showing the defendants can rebut by introducing evidence of procompetitive justifications for the arrangement. Should the conduct prove justifiably competitive, no § 2 conspiracy claim will lie.

## A. *Regency Failed to Define the Relevant Market*

"Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (citation omitted) (monopolization and attempt to monopolize). The relevant product market in any given case "is composed of products that have

32

reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)). And "[t]he geographic market is the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market." *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986) (internal quotation marks omitted). Together these factors define a real economic market for purposes of antitrust analysis. *See Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 68 (1st Cir. 2002) (holding that although there may be some exceptions, as a general matter a conspiracy-to-monopolize claim requires proof of a real economic market).

In responding to Campus Village's motion for summary judgment, Regency argued that § 2 conspiracy-to-monopolize claims do not require proof of a relevant market. The district court agreed and rejected Campus Village's call to have Regency define the relevant market. Instead, Regency was required to define only the "segment of commerce" allegedly impacted by Campus Village's actions, which it claims was "the rental of dedicated student housing" for "UCD students attending the Auraria campus in downtown Denver." On appeal, Regency defines the "part of commerce" in a slightly different manner, as the business "of private, off-campus rental housing in downtown Denver dedicated for Auraria students, particularly UCD domestic and international freshmen."

33

But framed in either manner, Regency failed to define a true economic market. In particular, Regency's "market definition is underinclusive. . . . [T]he relevant market is one that reflects the total market demand for plaintiffs' product, not just defendants' demand." *Campfield*, 532 F.3d at 1118. It must take into account "competitive substitutes." *Id*. Instead of focusing on a real economic market, "it is clear that [Regency's] focus is upon a contractually created class of consumers"— UCD domestic and international freshmen. *See Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 85 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). And "[e]conomic power derived from contractual arrangements affecting a distinct class of consumers cannot serve as a basis for a [conspiracy-to-monopolize] claim." *See id*. Here, Regency advertises its housing only to students at UCD and the nearby educational institutions, so its market is restricted by choice, rather than by necessity. And the "part of commerce" it has identified for purposes of this litigation fails even to consider other educational institutions in Denver, or other segments of the broader Denver rental market. Instead, for all practical purposes, Regency asked the district court to examine the effect of Campus Village's conduct on Regency—a single *competitor*—rather than its impact on *competition* generally.

By defining the market in such narrow terms, Regency failed to identify a real economic market. But its failure to do so may be attributable to its reasonable reliance on *Salco*'s holding that it need not identify the relevant market to pursue a conspiracy-to-monopolize claim. Accordingly, we reverse the jury's verdict but

34

remand to provide Regency a fair opportunity to identify the relevant market. *See Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006).

## B. *Section 2 Conspiracy Claims Must Be Contextualized*

In remanding the case, we note that an important threshold to cross in any antitrust action is the proper classification of the alleged conduct. *See, e.g.*, *id*. at 46 (noting that, under § 1, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power *in the tying product*" (emphasis added)); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013) (rejecting the plaintiff's attempt "to recast [the defendant's] conduct as an 'affirmative' act of interference with a rival rather than a 'unilateral' refusal to deal" in an attempt to avoid the more rigorous showing under the refusal-to-deal doctrine). That focus is necessary because the ultimate inquiry is whether the defendants' conduct had anticompetitive effects in the particular markets affected. While horizontal price fixing may easily be deemed pernicious in the target product market, other conduct, such as a tying arrangement, may involve closer scrutiny of the tying-product and tied-product markets to determine if the conduct is anticompetitive. And although a plaintiff may try to obfuscate the true character of the defendants' conduct in an attempt to repackage an unprovable § 1 claim into a § 2 conspiracy claim, it cannot avoid the relevant market requirement "by the simple trick of calling the agreement a conspiracy to monopolize." *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 809 (4th ed. 2015) ("[O]ne must doubt whether the 'conspiracy to monopolize' language of §2 was ever intended to reach nonhorizontal agreements at all."); *cf.*

35

*Energy Conversion Devices Liquidation Trust v. Trina Solar Ltd.*, 833 F.3d 680, 688 (6th Cir. 2016) ("[Plaintiff] first argues that the label 'predatory pricing' and the requirement of proof of recoupment attached to it applies only to claims under § 2 of the Sherman Act, not § 1. That is word play. The Supreme Court has already used 'predatory pricing' to describe claims in each setting, whether filed under one section or the other.") Instead, the § 2 claim is dependent upon a close examination of the underlying conduct, its proper treatment under the antitrust laws, and its impact on the affected market(s).

The district court considered the nature of the conduct alleged in this case, recognizing that proof of a relevant market would be required to establish an unlawful tying arrangement under § 1, but it ultimately concluded that § 2 conspiracy claims were distinct. And because the court construed Campus Village's characterization of the conduct as a tying arrangement as an affirmative defense, it put the onus of defining the relevant market on Campus Village, as a prerequisite of proving that defense. This was error, for two interrelated reasons. First, we have now departed from *Salco* based on the Supreme Court's decision in *Spectrum Sports* and its guidance on the proper interpretation of *Yellow Cab* and its progeny. With the benefit of this advantaged position, it is apparent the district court erred by relieving Regency of the obligation to identify the economic market(s) affected by Campus Village's and UCD's conduct as part of its § 2 conspiracy claim. And as we explained above, Regency defined the "part of commerce" impacted by the tied product market far too narrowly to constitute a real economic market.

36

Second, the issue of whether the conduct here constitutes a tying arrangement or some other anticompetitive scheme is not merely an affirmative defense; it informs the definition of the relevant market and the inquiry into competitive injury. By holding otherwise, the district court never considered the arrangement's impact on the § 2 conspiracy-to-monopolize analysis. Accordingly, we leave this issue for the district court to reconsider on remand.

## IV. STATUTE OF LIMITATIONS

Campus Village also claims the district court erred in ruling that Regency's claims were not barred by the statute of limitations. After the district court heard evidence on the issue, Campus Village filed a motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure, which the district court denied in an oral ruling, concluding that Campus Village's and UCD's enforcement actions at the beginning of each school year reset the statute of limitations. The district court permitted Regency to recover damages for school years beginning in August 2007, but it concluded that Regency was barred from recovering damages for the 2006–2007 school year "because the act to enforce the residency requirement at the beginning of that school year occurred outside the statute of limitations." We agree with the district court's analysis. In light of UCD's ongoing enforcement actions, the continuing conspiracy exception served to revive Regency's claims that would otherwise be time-barred.

37

"We review de novo a district court's decision to grant or deny a Rule 50(a) motion for judgment as a matter of law, applying the same standards as the district court." *Elm Ridge Expl. Co. v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013). "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Id.* (internal quotation marks omitted). This standard mirrors the summary judgment standard in that "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Under 15 U.S.C. § 15b, a claim under § 2 of the Sherman Act "shall be forever barred unless commenced within four years after the cause of action accrued." "The general rule is that an antitrust 'cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'" *Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). Stated otherwise, a cause of action accrues on the "particular date" that "a plaintiff feels the adverse impact of an antitrust conspiracy." *Zenith Radio Corp.*, 401 U.S. at 339. Here, the cause of action appears to have accrued in November 2005, when the residency requirement was promulgated and students for the upcoming school year were officially precluded from living at the Regency. For its part, Regency was clearly aware of the requirement by April 2006 when its attorneys sent a letter to Campus Village inquiring about the import of the residency requirement on

38

students. But at the very latest, Regency's claims initially accrued in August 2006, as Campus Village contends, when the 2006–2007 school year began and the first set of students began living at Campus Village.

Because Regency did not file suit until over four years later—October 2010—its claims are barred absent tolling or some other exception to the statute of limitations. Regency does not dispute that it first learned of the residency requirement outside of the statute of limitations, but it claims the "continuing conspiracy" exception to § 15b applies, which provides:

> In the context of a continuing conspiracy to violate the antitrust laws, each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and as to those damages, the statute of limitations runs from the commission of the act. The exception thus has two requirements that are not entirely consistent: [1] the acts in question must be distinct from the acts outside the limitations period, but [2] they must continue the same conspiracy.

*Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088 (10th Cir. 2006) (alterations and internal quotation marks omitted). Stated otherwise, an overt act will restart the statute of limitations under the continuing conspiracy exception when the act is (1) "a new and independent act that is not merely a reaffirmation of a previous act"; and (2) the act "inflict[s] new and accumulating injury on the plaintiff." *Kaw Valley*, 872 F.2d at 933 (internal quotation marks omitted). The act must be more than "the abatable but unabated inertial consequences of some pre-limitations action." *Id.* (internal quotation marks omitted).

"Whether an antitrust violation should be characterized as a single act or continuing violation is best determined by considering the type of violation

39

involved." 8 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation*, § 162.02[2] (2d ed. 2016). Here, both parties adopt the "refusal to deal" framework, even though the conduct at issue does not fit neatly within that construct. Notwithstanding, the principles enunciated in both *Champagne Metals* and *Kaw Valley* inform our analysis. In *Champagne Metals*, this court addressed the continuing conspiracy exception as applied to a horizontal group boycott. 458 F.3d at 1078. In that context, we readily determined that the defendants' initial conspiracy to exclude a competitor was not "final," since the alleged boycott required ongoing enforcement efforts, which inflicted "new and accumulating injury" on the competitor. *Id*. at 1089–90 (internal quotation marks omitted). Accordingly, we ruled that the continuing conspiracy exception applied.

By contrast, in *Kaw Valley*, we ruled that the exception did not apply. 872 F.2d at 934–35. In that case, an electrical cooperative issued a pronouncement clearly barring non-member cooperatives from accessing power. That refusal, unlike the exclusionary conduct in *Champagne Metals*, was decreed by a single entity, required no ongoing enforcement efforts, and subsequent refusals did not inflict accumulating injury. The refusal "sent a clear message" to the non-member cooperative that "it would have to join up or litigate." *Id*. at 935. The finality of the decree was clear, the injury was immediate and circumscribed, and we therefore concluded that the continuing conspiracy exception did not apply. *Id*.

Here, the allegation is that UCD and Campus Village conspired to exclude Regency from the UCD freshmen student housing market. Their initial conspiratorial

decision—the promulgation of the residency requirement—was not "final" in the nature of *Kaw Valley*, as UCD's efforts to enforce the requirement each year make clear. Moreover, the injury to Regency was "new and accumulating" in two senses: first, a new group of students was excluded each year as a result of the requirement; second, UCD and Campus Village *broadened* the requirement in later years to encompass a larger group of students. As a result, the district court correctly determined that the continuing conspiracy exception applied.

## V. STATE ACTION IMMUNITY

As a final matter, Campus Village argues Regency's claims are barred by state-action immunity. The application of the state-action immunity doctrine presents a question of law, which we review de novo. *Trigen Okla. City Energy Corp. v. Okla. Gas & Elec. Co.*, 244 F.3d 1220, 1225 (10th Cir. 2001). As a general principle, "state action immunity is disfavored." *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1110 (2015) (internal quotation marks omitted).

Early in the litigation, Campus Village raised the defense of state action immunity in a motion to dismiss, which the district court denied. Campus Village then filed an interlocutory appeal from the district court's order, and Regency filed a motion to dismiss the appeal, claiming this court lacked jurisdiction. *Campus Village I*, 703 F.3d 1147 (10th Cir. 2013). We refused to broaden the collateral order doctrine to permit Campus Village (a private entity) to appeal from the non-final order, and granted Regency's motion to dismiss the appeal. *Id.* at 1153. Now that the district

41

court's orders are properly before us, Campus Village again appeals the district court's ruling denying its motion to dismiss on state action immunity grounds. We hold that the state action immunity doctrine does not preclude Regency's claims, and we therefore affirm the district court's order.

"The state action immunity doctrine . . . exempts qualifying state and local government regulation from federal antitrust, even if the regulation at issue compels an otherwise clear violation of the federal antitrust laws." *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1498 (10th Cir. 1997) (citation and internal quotation marks omitted). "Although the doctrine was [originally] aimed at protecting state legislatures and state supreme courts acting in their legislative capacities, it can provide protection to other individuals or entities acting pursuant to state authorization." *Id*. This includes private parties. *Campus Village I*, 703 F.3d at 1149. But "[i]n such situations, . . . closer analysis is required to determine whether antitrust immunity is appropriate." *Zimomra*, 111 F.3d at 1498 (internal quotation marks omitted).

The Supreme Court's *Midcal* decision sets forth the governing test for when state action immunity will be extended to non-state actors—(1) "the challenged restraint must be one clearly articulated and affirmatively expressed as state policy," and (2) "the policy must be actively supervised by the State itself." *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980) (internal quotation marks omitted). Where a private party seeks to invoke the immunity, the threshold question is whether that party must satisfy both requirements, or whether it

need satisfy only the first requirement, as is the case for municipalities. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46–47 (1985) ("*Town of Hallie* test"). In *Zimomra*, this court applied the *Town of Hallie* test to private rental car companies because those companies had no discretion on whether to engage in the allegedly anticompetitive conduct (the imposition and collection of a daily airport usage fee as required by a county ordinance). 111 F.3d at 1498–1501.

Here, Campus Village argues that, in light of UCD's clear involvement in promulgating the residency requirement, no showing of "active supervision" is required. Regency's tactical decision to exclude UCD as a party to the litigation does not mean the other alleged conspirator—Campus Village—must therefore satisfy the second prong of *Midcal*. And regardless, UCD—a constitutionally created state institution—has actively supervised both the residency requirement (which it promulgated) and the other steps of its arrangement with Campus Village. Regency claims instead that Campus Village (a private entity) was the sole actor involved in "setting rental rates" such that the active supervision requirement is not met. But the allegedly anticompetitive arrangement relied on by Regency was not the setting of rental rates—it was the residency requirement itself.

The district court in this case applied the *Town of Hallie* test and concluded that Campus Village was not required to show that the residency requirement was actively supervised by the State itself. We need not consider whether this was correct because even if Campus Village is excused from meeting the second prong of the *Midcal* test, it cannot meet its burden of establishing that the residency requirement

43

was "clearly articulated and affirmatively expressed as state policy." *Midcal*, 445 U.S. at 105.

Whether a state policy is clearly and affirmatively expressed such that immunity extends to private parties is a matter of degree. *Id.* In *Kay Electric Cooperative v. City of Newkirk*, this court stated that, at minimum, a municipal defendant seeking state action immunity "bear[s] the burden of showing that its challenged conduct was *at least* a foreseeable (if not explicit) result of state legislation." 647 F.3d 1039, 1043 (10th Cir. 2011). Acknowledging that "what does and doesn't qualify as foreseeable is hardly 'self-evident,'" *id.*, we identified a few bright line rules to be used to inform the analysis. First, we determined that standard charters authorizing municipalities to enter contracts, buy and sell property, or form joint ventures, do *not* make a municipality's anticompetitive conduct foreseeable. *Id.* We reasoned that such power is available generally to both individuals and artificial entities, but gives them no right to engage in anticompetitive activity. *Id.* The second bright line rule this court set forth was, "the fact that a state may have authorized *some* forms of municipal anticompetitive conduct isn't enough to make *all* forms of anticompetitive conduct foreseeable." *Id.* at 1043–44. Third, we noted that any immunity granted must be defined by "the most specific direction issued by the state legislature on the subject." *Id.* at 1044. Indeed, the United States Supreme Court later noted that the concept of foreseeability here cannot be applied "too loosely." *FTC v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1012 (2013). Stated in a different light—and as recognized by the district court—"there must be a clearly articulated

and affirmatively expressed state policy to *displace competition.*" *Allright Colo., Inc. v. City & Cty. of Denver*, 937 F.2d 1502, 1507 (10th Cir. 1991) (emphasis added) (internal quotation marks omitted). To answer whether such policy exists in this case, we must turn to the governing Colorado statutes, housed in the Colorado Educational and Cultural Facilities Authority Act (the Act).

That Act does not provide the requisite "clearly articulated and affirmatively expressed state policy." *Id*. To be sure, the Act empowers the Colorado Educational and Cultural Facilities Authority (CECFA or the Authority) to construct, acquire, and otherwise maintain "housing facilit[ies]" and "recreational facilit[ies]." Colo. Rev. Stat. § 23-15-103(8.5)(a)(I)(A). It is also true that the Act empowers the Authority to issue bonds and require "any agreements and provisions" related to "the fixing and collection of mortgage payments, rents, fees, and other charges" as part of its contracts with bondholders related to the financing of housing and other facilities. *Id*. § 23-15-112(1)(c). Such agreements may be entered into in order to ensure "the security of the holders of such bonds or notes." *Id*. § 23-15-112(1)(*l*). But neither of these provisions—nor any other provision cited by Campus Village—clearly articulates a state policy "to displace competition." *Allright Colo.*, 937 F.2d at 1507. As with the powers conferred to municipalities by charter in *Kay Electric*, every issuer of bonds has the authority to require sufficient collateral or security to protect the holders' underlying investment. The fact that the Act here similarly grants the Authority permission to enter into agreements to ensure "the security of the holders of such bonds or notes" does *not* mean the legislature blessed anti-competitive

45

behavior in the marketplace. Colo. Rev. Stat. § 23-15-112(1)(*l*). At bottom, these provisions collectively do nothing more than grant CECFA and other institutions powers that are common in the marketplace. And there is nothing in the statutes that makes anticompetitive activity foreseeable. *See Kay Elec.*, 647 F.3d at 1043 ("[S]imple permission to play in a market doesn't foreseeably entail permission to roughhouse in that market unlawfully."). Accordingly, the district court properly determined that state action immunity did not apply.

## VI. CONCLUSION

To prove a conspiracy to monopolize under § 2 of the Sherman Act, the plaintiff must identify the relevant market. Regency failed to do so in this case. But because Regency reasonably relied on our contrary holding in *Salco*, we instruct the district court to provide Regency an opportunity to define the relevant market on remand. Accordingly, we VACATE the jury verdict and REMAND for proceedings consistent with this decision. Having disposed of this appeal, we also DISMISS as moot Regency's motion to strike ¶3 of Campus Village's supplemental authority.